IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA22-919

Filed 16 April 2024

Union County, No. 20CVS1882

CRAIG SCHROEDER AND MARY SCHROEDER, Plaintiffs,

v.

THE OAK GROVE FARM HOMEOWNERS ASSOCIATION A/K/A THE OAK GROVE FARM HOMEOWNERS ASSOCIATION, INC., Defendant.

Appeal by plaintiffs from judgment entered 18 March 2022 and order entered 3 May 2022 by Judge Jonathan W. Perry in Superior Court, Union County. Heard in the Court of Appeals 9 May 2023.

> *Higgins Benjamin, PLLC, by John F. Bloss, for plaintiffs-appellants.*
>
> *McAngus Goudelock & Courie, PLLC, by Colin E. Scott, for defendant-appellee.*

STROUD, Judge.

Plaintiffs appeal from the trial court's judgment ordering them to pay $31,500.00 in homeowners association fines for violation of restrictive covenants, specifically, keeping chickens on their lot based on the jury's verdict that the Plaintiffs' chickens were not "household pets." Because the trial court did not interpret the language of the restrictive covenants correctly, and made rulings based on a misapprehension of the law regarding the restrictive covenants, we reverse the judgment and remand for entry of judgment notwithstanding the verdict in favor of Plaintiffs.

## I.    Background

Plaintiffs owned land and a home in a housing development known as Oak Grove Farm.  Defendant Oak Grove Farm Homeowners Association ("Defendant HOA") is the homeowners association for the Oak Grove Farm development. Plaintiffs' lot is subject to restrictive covenants, including Section 13, entitled "LIVESTOCK":

> A maximum of three horses may be kept and stabled on any lot or combination of adjoining lots under common ownership. . . . *No other animals, livestock, or poultry of any kind shall be raised, bred, or kept on any lot, except that dogs, cats, or other household pets, may be kept provided that they (including horses) are not kept, bred, or maintained for any commercial purpose.* No dog kennels of any type shall be kept or maintained on the property.

(Emphasis added.)

After Defendant instituted an enforcement action against Plaintiffs and imposed fines for violation of Section 13 of the restrictive covenants, on 31 August 2020, Plaintiffs filed a verified complaint requesting a declaratory judgment that "their flock of pet chickens do not violat[e]" the restrictive covenants, an injunction against enforcement of the covenants against them, and alleging a claim for "breach of fiduciary duty/selective enforcement[.]"  (Capitalization altered.)  On or about 13 November 2020, Defendant filed a motion to strike and/or dismiss, an answer denying most of the substantive allegations, and counterclaims for "declaratory judgment and permanent injunction."

A jury trial on all claims began on 15 February 2022. At trial, Plaintiffs presented evidence which tended to show that before moving into Oak Grove Farm, Plaintiffs made inquiries through their realtor and learned other residents were keeping chickens on their properties in Oak Grove Farm as "household pets," despite the restrictive covenant prohibiting "poultry." In 2017, Plaintiffs bought a home on a 17-acre lot in Oak Grove Farm, built a chicken coop, and bought their first hens.

On 11 March 2020, the Defendant HOA's property manager sent a letter demanding Plaintiffs remove "the poultry" and chicken coop from the property. Sometime in April 2020, Plaintiffs found a new home for all their chickens. On 16 April 2020, Defendant HOA requested an inspection of the property, and Plaintiff Mrs. Schroeder declined. Plaintiffs then consulted with an attorney and returned some of their chickens to the lot, keeping them in the barn. At some point, Plaintiffs kept as many as 60 chickens. After receiving another violation letter, Plaintiffs appeared at a hearing before Defendant HOA's Board – which consisted of two people, one of them being the property manager who had sent the initial violation letter – on or about 16 July 2020, and Defendant determined they were in violation of the "livestock" provision of the restrictive covenants and imposed a fine of $100 per day for keeping chickens in their barn.

Plaintiffs' flock included ornamental and fancy breeds of chickens. Mrs. Schroeder testified the chickens liked to be held and carried, and she spent an hour and a half to two hours with her chickens each day, took care of their medical needs,

and bathed and blow-dried them in the house. Plaintiffs testified every chicken knew its name and would come when called. Plaintiffs testified the chickens were not bred for meat, and they never ate any of them. Mrs. Schroeder admitted that in April of 2019, she wrote in a social media post she sold "farm fresh eggs" and was looking for a place to donate extra eggs; however, she testified she never sold the eggs, but she did give extra eggs to neighbors. Neighbors familiar with Plaintiffs and their chickens testified they saw Mrs. Schroeder holding the chickens and spending a lot of time with them.

In response to Defendant's imposition of fines, on 4 December 2021, Plaintiffs moved the chickens to a friend's property near Lake Norman, and Mrs. Schroeder commuted once or twice a week, an hour and twenty minutes each way, to visit the chickens. Mrs. Schroeder testified that the reason for moving the chickens was "[b]ecause the fines were just getting too much[,]" and "[w]e couldn't justify it anymore." Despite moving the chickens, Mrs. Schroeder stated when she visited them they would still recognize her and know their names.

At the close of Plaintiffs' evidence, Plaintiffs moved for a directed verdict, which the trial court denied. Before the case was submitted to the jury, Plaintiffs also requested specific jury instructions based primarily upon *Steiner v. Windrow Estates Home Owners Ass'n*, 213 N.C. App. 454, 713 S.E.2d 518 (2011), but their request was denied. Ultimately, the jury was asked to answer two questions; the first was: (1) "Were/Are the chickens that were raised bred or kept on the Plaintiffs'

property household pets?" Because the jury answered "No[,]" to that question they were not required to answer the second question, (2) "Were[/]are the Plaintiffs' chickens kept, bred or maintained for a commercial purpose?" After the jury was excused, the parties acknowledged that they had mutually agreed, "If jury rules in favor of Defendant, and they did, accrued fines of $31,500 would be included in the judgment aris[ing] from [the] phase 1 verdict." The parties further agreed to "release any claims for sanctions, attorney fees[,]" and Plaintiffs "dismiss[ed] count 3 [breach of fiduciary duty/selective enforcement] of complaint with prejudice[.]"

On 18 March 2022, the trial court entered a judgment declaring Plaintiffs in violation of the livestock provision and required them to pay $31,500.00. On 28 March 2022, Plaintiffs filed a motion for judgment notwithstanding the verdict ("JNOV"). The trial court denied the JNOV. Plaintiffs appeal from both the judgment and the trial court's denial of the motion for JNOV.

## II. Directed Verdict and JNOV

Plaintiffs contend the trial court should have granted their motions for directed verdict and JNOV, or at the very least, a new trial should be ordered.

### A. Standard of Review

> A motion for JNOV is simply a renewal of a party's earlier motion for directed verdict. Thus, when ruling on this motion, the trial court must consider the evidence in the light most favorable to the non-movant, taking the evidence supporting the non-movant's claims as true with all contradictions, conflicts, and inconsistencies resolved in the non-movant's favor so as to give the non-movant the

> benefit of every reasonable inference. Likewise, on appeal the standard of review for a JNOV is the same as that for a directed verdict, that is whether the evidence was sufficient to go to the jury. This is a high standard for the moving party, requiring a denial of the motion if there is more than a scintilla of evidence to support the non-movant's *prima facie* case.

*Ellis v. Whitaker*, 156 N.C. App. 192, 194-95, 576 S.E.2d 138, 140 (2003) (citations, quotation marks, ellipsis, and brackets omitted).

Thus, to prevail on a motion for directed verdict, Plaintiffs must first show as a matter of law that their chickens were their "household pets." If Plaintiffs establish that the chickens were household pets, they must also demonstrate as a matter of law they were not using their household pets for commercial purposes. Put simply, Plaintiffs must establish that the two questions the trial court presented to the jury should have never been given to the jury as the finder of fact based on the correct legal interpretation of the covenants. *Coletrane v. Lamb*, 42 N.C. App. 654, 657, 257 S.E.2d 445, 447 (1979) ("It is the province of the jury to weigh the evidence and determine questions of fact." (citation omitted)).

## B. Interpretation of Restrictive Covenants Generally

All the arguments on appeal require interpretation of the restrictive covenants, so we first address the legal standards for interpretation of the covenants. "Interpretation of the language of a restrictive covenant is a question of law reviewed *de novo*." *Erthal v. May*, 223 N.C. App. 373, 378, 736 S.E.2d 514, 517 (2012). Thus, "[i]nterpretation of the language of a restrictive covenant" is not a jury question, as

the jury is the finder of fact, not law. *Coletrane*, 42 N.C. App. at 657, 257 S.E.2d at

447. Further, "restrictive covenants are contractual in nature." *Erthal*, 223 N.C.

App. at 378, 736 S.E.2d at 517.

Restrictive covenants are a special form of contract, and they are strictly

construed to favor *unrestrained* use of real property:

> We also note that . . . while the intentions of the parties to restrictive covenants ordinarily control the construction of the covenants, such covenants are not favored by the law, and they will be strictly construed to the end that all ambiguities will be resolved in favor of the unrestrained use of land. The rule of strict construction is grounded in sound considerations of public policy: It is in the best interests of society that the *free and unrestricted* use and enjoyment of land be encouraged to its fullest extent.
>
> The law looks with disfavor upon covenants restricting the free use of property. As a consequence, the law declares that nothing can be read into a restrictive covenant enlarging its meaning beyond what its language plainly and unmistakably imports.
>
> Covenants restricting the use of property are to be strictly construed against limitation on use, and will not be enforced unless clear and unambiguous. This is in accord with general principles of contract law, that the terms of a contract must be sufficiently definite that a court can enforce them. Accordingly, courts will not enforce restrictive covenants that are so vague that they do not provide guidance to the court.

*Id.* at 379-80, 736 S.E.2d at 518-19 (emphasis added) (citation and brackets omitted).

Further, restrictive covenants should be interpreted in accord with the intent

of the parties and all covenants should be read together:

> Restrictive covenants are strictly construed, but they should not be construed in an unreasonable manner or a manner that defeats the plain and obvious purpose of the covenant. The fundamental rule is that the intention of the parties governs, and that their intention must be gathered from study and consideration of *all* the covenants contained in the instrument or instruments creating the restrictions. Covenants that restrict the free use of property are to be strictly construed against limitations upon such use.
>
> In interpreting restrictive covenants, doubt and ambiguity are resolved in favor of the unrestricted use of property, so that where the language of a restrictive covenant is capable of two constructions, the one that limits, rather than the one which extends it, should be adopted, and that construction should be embraced which least restricts the free use of the land.

*Danaher v. Joffe*, 184 N.C. App. 642, 645, 646 S.E.2d 783, 785-86 (2007) (emphasis in original) (citations, quotation marks, and brackets omitted). With these principles in mind, we must consider the relevant provisions of the restrictive covenants at issue here.

## C. Restrictive Covenants regarding Animals

The primary relevant provisions are:

> 12. PETS. Any person or entity having a possessory property right in an animal as defined by the Union County Animal Control Ordinance shall keep said animal within the bounds of the subdivision herein restricted and shall be kept leashed when off the owner's premises.
>
> 13. LIVESTOCK. A maximum of three horses may be kept and stabled on any lot or combination of adjoining lots under common ownership. In the event of ownership of multiple lots, the owner shall be entitled to increase the

number stabled by the number of contiguous lots owned. (For example: The owner of two contiguous lots may stable six horses.) *No other animals, livestock, or poultry of any kind, shall be raised, bred, or kept on any lot, except that dogs, cats, or other household pets, may be kept provided that they (including horses) are not kept, bred, or maintained for any commercial purpose.* No dog kennels of any type shall be kept or maintained on the property.

(Emphasis added.)

We also note that Section 30 of the covenants, while not speaking directly about pets or animals, provides that the "captions preceding the various Articles of these Restrictions are for the convenience of reference only, and *shall not* be used as an aid in interpretation or construction of these restrictions[.]" (Emphasis added.) This covenant is consistent with general contract law, as

> *headings do not supplant actual contract language and are not to be read to the exclusion of the provisions they precede.* Moreover, a contract must be construed as a whole, considering each clause and word with reference to all other provisions and giving effect to each whenever possible.

*Canadian Am. Ass'n of Pro. Baseball, Ltd. v. Ottawa Rapidz*, 213 N.C. App. 15, 20, 711 S.E.2d 834, 838 (2011) (emphasis added). But we also remain mindful we must "study and consider[ ] . . . *all* the covenants contained in the instrument or instruments creating the restrictions." *Danaher*, 184 N.C. App. at 645, 646 S.E.2d at 786. Section 12 specifically defines "said animal" based on the Union County Animal Control Ordinance ("Ordinance"): "an animal *as defined* by the Union County Animal Control Ordinance shall keep said animal[.]" (Emphasis added). Thus, without using

the heading "Pets" to supply a definition of "pets," in accord with Section 30, we must still give full effect to the substance of Sections 12 and 13.

Thus, considering both Sections 12 and 13, these sections use six terms which may apply to animals other than horses, dogs, or cats. These terms are "pets," "animals," "an animal as defined by the Union County Animal Control Ordinance," "livestock," "poultry," and "household pets." Although the trial court focused only on Section 13, entitled "LIVESTOCK[,]" in interpretation of the restrictive covenants, "we are required instead to examine and interpret the covenants in their entirety." *See Erthal*, 223 N.C. App. at 381, 736 S.E.2d at 519 ("Plaintiffs ask that we look only to the word 'pasturing' to determine the meaning of the covenants, as they attempt to extrapolate a prohibition on 'commercial' pasturing (as opposed to 'private' pasturing) from the word 'pasturing', but we are required instead to examine and interpret the covenants in their entirety." (citation omitted)). As we are required to read the covenants "in their entirety[,]" *id.*, we cannot ignore Section 12 as the trial court did.

Section 12, entitled "PETS[,]" refers to "an animal as defined by the" Ordinance. Section 13 also uses the term "animal," and the definition of "animal" as defined by the Ordinance used in Section 12 would logically apply to the word "animal" in Section 13. In other words, the definition of the word "animal" in both Sections 12 and 13 is provided by reference to the definition in the Ordinance.

Turning to the Ordinance, "animal" is defined as "any live, vertebrate creature,

wild or domestic, other than human beings, endowed with the power of voluntary motion." Certainly, chickens are "animals" as defined by the Ordinance. Thus, Section 12 provides that "any live, vertebrate creature, wild or domestic, other than human beings, endowed with the power of voluntary motion" should be kept within the subdivision bounds and leashed "when off the owner's premises."[1] Essentially, Section 12 provides that pets – which may include any sort of "animal" as defined by the Ordinance – must be leashed when not on the owner's premises.

Section 13 provides more detailed requirements as to animals. This section refers to three specific types of animals – horses, dogs, and cats – and more generally to "*other animals,* livestock, or poultry of any kind." (Emphasis added.) Section 13 does not include any language which explains what a "household pet" is, and the primary language relevant here is:

> No other animals, livestock, or poultry of any kind, shall be raised, bred, or kept on any lot, except that dogs, cats, or other household pets, may be kept provided that they (including horses) are not kept, bred, or maintained for any commercial purpose.

In context, "no *other* animals" refers back to horses, as the first two sentences of Section 13 specifically provide that up to three horses can be kept per lot in the

---

[1] We pause to note this provision technically provides that an owner's pet must be kept *within the bounds of the subdivision*. The reference to the subdivision bounds instead of a lot is likely a typographical error in the covenants, but fortunately there is no issue on appeal regarding this particular provision. Plaintiffs did not argue they were prohibited from removing the chickens from the subdivision based upon this provision of Section 12.

development. (Emphasis added.) From the first two sentences, it is clear homeowners may keep up to three horses per lot. There is no limitation on the number of other types of animals allowed to be kept, including "dogs, cats, or other household pets." Further, horses must not be "kept, bred, or maintained for any commercial purpose" and dog kennels are prohibited, although other provisions of the restrictive covenants allow "a maximum of one accessory building" per lot. Thus, for purposes of this case, effectively the covenant reads, "[Other than horses, no] livestock or poultry of any kind, shall be raised, bred, or kept on any lot, except that dogs, cats or other household pets, may be kept provided that they . . . are not kept, bred, or maintained for any commercial purpose."

Further, since the word "household" is an adjective modifying the noun "pet," an animal must first fall within the definition of "pet" before it can be classified as a "household pet." *See Steiner v. Windrow Estates Home Owners Ass'n, Inc.*, 213 N.C. App. 454, 462, 713 S.E.2d 518, 524 (2011) ("We first note that the word 'household' may be either a noun or an adjective; here it is used as an adjective, modifying the word 'pet.' While Merriam-Webster's Collegiate Dictionary does not define 'household pet,' it does define 'household' as an adjective in pertinent part as 'of or relating to a household: DOMESTIC[.]' Thus, the adjective definition of 'household' requires that one consider the noun definition of 'household.' 'Household' as a noun is defined as 'those who dwell under the same roof and compose a family; *also*: a social unit composed of those living together in the same dwelling[.]'" (emphasis in original)

(citations omitted)).

Thus, in summary, and as relevant to this case, the restrictive covenants provide pets, which may include "any live, vertebrate creature, wild or domestic, other than human beings, endowed with the power of voluntary motion" should not be kept on an owner's property *unless* it is a horse, dog, cat, or "household pet," and none of these animals may be kept for commercial purposes. Even if Plaintiffs' chickens are considered "poultry" under the covenants, they still may be kept on the property so long as they meet the definition of "household pets." *See Bryan v. Kittinger*, 282 N.C. App. 435, 438, 871 S.E.2d 560, 562 (2022) ("While the first clause forbids the keeping of any 'animals,' the second clause clearly allows the keeping of animals, so long as they are 'household pets' and otherwise not used for a commercial purpose. In the same way, where the first clause forbids the keeping of 'poultry,' the second clause could be reasonably read to allow poultry—which, we note, are animals—kept as 'household pets' and otherwise not kept for any commercial purpose.").

**D. Evidence regarding "Household Pets"**

We will now consider the trial court's ruling on Plaintiffs' motion for JNOV. As discussed above,

> A motion for JNOV is simply a renewal of a party's earlier motion for directed verdict. Thus, when ruling on this motion, the trial court must consider the evidence in the light most favorable to the non-movant, taking the evidence supporting the non-movant's claims as true with all contradictions, conflicts, and inconsistencies resolved in the non-movant's favor so as to give the non-movant the

> benefit of every reasonable inference. Likewise, on appeal the standard of review for a JNOV is the same as that for a directed verdict, that is whether the evidence was sufficient to go to the jury. This is a high standard for the moving party, requiring a denial of the motion if there is more than a scintilla of evidence to support the non-movant's *prima facie* case.

*Ellis*, 156 N.C. App. at 194-95, 576 S.E.2d at 140 (citations, quotation marks, ellipsis, and brackets omitted).

As to the first question, whether Plaintiffs' chickens were household pets, Plaintiffs contend they were entitled to judgment as a matter of law because "[a]ll witnesses, including Defendant's designated Board representative and its only fact witness, admitted without reservation that . . . [Plaintiffs] share the same love and bond with their chickens that others have with more traditional pets." Defendant argues there was more than enough evidence to take the case to the jury.

### 1. *Plaintiffs' Evidence regarding "Household Pets"*

We have provided much of Plaintiffs' relevant evidence in the background section, but we again note, Plaintiffs' evidence included the chickens liked to be held and carried, and Mrs. Schroeder spent an hour and a half to two hours with her chickens each day, took care of their medical needs, and bathed and blow-dried them in the house. Plaintiffs testified every chicken knew its name and would come when called. Plaintiffs testified the chickens were not bred for meat, and they never ate any of them. Mrs. Schroeder admitted that in April of 2019, she wrote in a social media post she sold "farm fresh eggs" and was looking for a place to donate extra

eggs; however, she testified she never sold the eggs, but she did give extra eggs to neighbors. After having the chickens removed, Mrs. Schroeder drove over an hour each way once to twice a week to visit the chickens. Neighbors familiar with Plaintiffs and their chickens testified they saw Mrs. Schroeder holding the chickens and spending a lot of time with them.

### 2. *Defendant's Evidence regarding "Household Pets"*

Defendant did not dispute Plaintiffs' evidence regarding how they cared for or treated their chickens. Instead, Defendant presented evidence from its two Board members, Mr. Frye and Ms. Tucker, of their own personal interpretations of the covenants and sought to use these interpretations as the controlling law. Mr. Frye and Ms. Tucker interpreted the covenants as saying chickens are "poultry" and incapable of being household pets. Mr. Frye testified that he and Ms. Tucker determined Plaintiffs were in violation of Section 13 because it entirely prohibits "poultry" from being a "household pet[.]" Mr. Frye testified "there is no way that chickens can be household pets[,]" and the Board determined Plaintiffs were in violation

> [b]ecause it says no poultry of any kind. So I consider chickens poultry. I do not believe that they qualify as household pets. We've talked about this definition before and I -- my interpretation or the association's interpretation is that household pets are those that are maintained inside the house.

Mr. Frye acknowledged the Board had considered various animals other than

cats and dogs as "household pets" and specifically considered dogs and cats as "household pets" even if they lived outside of the house. According to Mr. Frye, guinea pigs, hamsters, parrots and rabbits are "household pets[,]" but a goat cannot be a "household pet" because it is "livestock" and not "typically kept as [a] household pet[]." Mr. Frye further acknowledged another resident of Oak Grove Farms once had a "pig as a pet," which he did not consider a "traditional pet" but it "seemed to be their household pet[,]" and he was not on the Board at that time. Mr. Frye also testified the number of chickens on Plaintiffs' lot was not an issue to the Board and agreed that "[o]ne chicken is a violation, 25 chickens are a violation, according to the association." But the meaning of a restrictive covenant cannot be based on the subjective beliefs of the Defendant's Board members at a particular moment; the restrictive covenant must first be interpreted as a matter of law by the court. *See generally Erthal*, 223 N.C. App. at 378, 736 S.E.2d at 517 ("Interpretation of the language of a restrictive covenant is a question of law reviewed *de novo*.").

Plaintiffs' counsel then asked Mr. Frye about the definition of "pet" as an "animal" as defined in the Ordinance. Defendant's counsel then raised an objection to Plaintiffs' use of the Ordinance definition of "animal." Defendant cited no rule of evidence to support the objection to the very definition supplied by the restrictive covenants but instead argued Mr. Frye was "not an expert. He's being treated as an expert" although Mr. Frye himself had testified he and Ms. Tucker were the sole interpreters of the restrictive covenants. Defendant also argued that "Number 12,

[the 'PETS' provision,] isn't an issue. Number[ 13, the livestock provision, actually says household pets, which is a different term than pets."

After an extensive discussion with counsel, the trial court ultimately sustained Defendant's objection to Plaintiffs' use of the definition of "animal" in the Ordinance and questioning Mr. Frye on this definition, ruling that

> [a]s I'm looking at it the question related for [Plaintiffs' counsel] to provision Number 12 of the covenants and restrictions, which was labeled pets, I mean that looks to me like it's just a leash law, to put it in simple terms. That contains a reference to the Union County Animal Control Ordinance. The Union County Animal Control Ordinance has been handed up, and there is a definition of animals. So I mean under 401 given the broad definition of relevance I do think it's relevant, but at the same time under 403 I think it's got the tendency to mislead the jury with the simple definition of animals and that only reference in Section 12, which seems pretty clear to me just relates to control of animals. I'm going to find in the sense of misleading it's more prejudicial than probative so I'm not going to let it in.[2]

### 3. *Definition of "Household Pets"*

As the trial court failed to interpret the covenants as a matter of law to provide guidance as to the meaning of "household pets[,]" and Plaintiffs' argument on appeal is that the chickens are "household pets" as a matter of law, we must now determine what "household pets" means. *See generally Norman Owen Trucking, Inc., v.*

---

[2] Although we will not address Plaintiffs' issue on appeal as to the exclusion of this evidence, the trial court's ruling tends to illustrate the fundamental problem of the lack of an interpretation of the covenants by the trial court before considering whether any issues of fact remained for submission to the jury.

*Morkoski*, 131 N.C. App. 168, 178, 506 S.E.2d 267, 273-74 (1998) (wherein this Court determined the matters of law in a JNOV and did not remand back to the trial court for such determinations). We have already noted that under Section 12 a pet is an "animal" that includes "any live, vertebrate creature, wild or domestic, other than human beings, endowed with the power of voluntary motion" and household is an adjective modifying "pet." *See Steiner*, 213 N.C. App. at 462, 713 S.E.2d at 524-25.

During the trial, Plaintiffs requested jury instructions based on the language defining the term "pet" from *Steiner*: "6. Merriam-Webster's Dictionary defines a 'pet' as 'a domesticated animal kept for pleasure rather than utility.'" *Id.*

In *Steiner*, the question was if goats were prohibited as "livestock" or allowed as "household pets" per the restrictive covenants. *Id*. at 458-59, 713 S.E.2d at 522-23. The plaintiffs owned two dwarf Nigerian goats they considered as household pets, while the defendant HOA claimed the goats were "livestock" and therefore prohibited. *Id*. at 455, 713 S.E.2d at 520. Windrow Estates was also an equestrian community where the covenants specifically allowed horses. *Id*. In *Steiner*, this Court considered the interpretation of a restrictive covenant very similar to the covenant in this case:

> 18. Restrictive Covenant 9 states: "No animals, livestock or poultry of any kind shall be raised, bred or kept on any lot except that horses, dogs, cats or other pets may be kept provided they are not kept, bred, or maintained for any commercial purposes, unless allowed by Windrow Estates Property Owners' Association, and provided that such household pets do not attack horses or horsemen."

*Id*. at 455-56, 713 S.E.2d at 521.

- 18 -

In *Steiner*, the covenants did not provide any definition for "household pet" or "pet[,]" and thus this Court used the dictionary definition for "pet." *See id*. at 459, 713 S.E.2d at 522-23. This Court ultimately affirmed the trial court's order granting summary judgment in favor of the Steiners because the goats were "household pets" based on the plain language of the covenant:

> Defendant next contends that because "the goats are not kept in the house, but instead outside with the horses they are not household pets. . . .
>
> Despite defendant's argument, we do not find the fact that the goats do not literally live *inside* the house to be dispositive of the issue. First, the "ordinary meaning" of the adjective "household" requires that something be "of or relating to" the household, not actually inside of the house. This definition is consistent with a practical and commonsense understanding of the term "household pet." Many pet owners keep their dogs in a pen in the backyard and do not permit them into the house; many pet owners have a cat which lives outside and may more often than not be found wandering in a neighbor's yard rather than its own, yet these animals are most certainly considered "household pets" by their respective owners. Fred and Barney "walk on a leash in the Steiners' yard;" "follow the Steiners around in their enclosure and in the yard; and sleep in an Igloo Dog House of medium size that is placed within the stable of the Property." Again, defendants do not challenge the facts as to Fred and Barney's living conditions and relationship to the plaintiffs. We conclude that there is no issue of material fact that Fred and Barney are "household pets" within the meaning of paragraph 9 of the Restrictive Covenants. Had the drafters of the Restrictive Covenants wished to limit the definition of "household pets" to animals more traditionally considered as pets, such as dogs and cats, they certainly may have done so; instead the Restrictive Covenants expands the variety of animals which may be considered as pets by

allowing for other pets, which in this instance includes the goats Fred and Barney.

*Id*. at 462-63, 713 S.E.2d at 524-25 (emphasis in original) (citations, ellipses, brackets, and footnote omitted).

While here, a definition of "animal" is provided to aid in interpreting "pet," this definition does not limit the range of animals which may be considered as pets, as the definition from the Ordinance includes all vertebrate moving creatures other than humans. There is some difference between the broad definition of "animal" in Section 12 and the types of animals covered by the dictionary definition of "pet" as the Ordinance would include wild animals while the definition used in *Steiner* includes only domesticated animals, *see id*. at 462, 713 S.E.2d at 524-25, but that difference is not relevant in this case. Defendant did not claim the chickens were wild; all the evidence showed these chickens were domesticated animals.

As all the evidence showed the chickens were "pets" under the definition from *Steiner*, we must then consider the issue of whether they were "household pets." Defendant's own evidence included testimony that Plaintiffs had the same connection and relationship with their chickens as other people have with more traditional pets. Mr. Frye testified:

> Q: . . . . Does the Board have any evidence that Mary Schroeder lacks a personal connection with her chickens?
>
> A: Based on the pictures presented, no.
>
> Q: And so does the Board have any indication that Mary

> has - - lacks a relationship with the chickens that other people have with more traditional pets?
>
> A: Based on the pictures, no.
>
> Q: Well, based on anything?
>
> A: No, sir.

At trial, Defendant did not dispute the *facts* of Plaintiffs' relationship with their chickens but instead took the position that Section 13 was an absolute prohibition on chickens, as "poultry." On appeal, Defendant contends the number of chickens alone creates a jury question as to whether the chickens were "household pets." Defendant notes that at the highest point, Plaintiffs had about 60 chickens, although they later reduced the number to about 25 by the time of the HOA complaint and hearing. Defendant correctly notes that in *Bryan*, the defendants had only four chickens. *See Bryan*, 282 N.C. App. at 436, 871 S.E.2d at 561. But the facts of the *Bryan* case as to the number of chickens is not a controlling legal principle. As we noted previously, restrictive covenants must be strictly construed and here, the covenants do not limit the number of dogs, cats, or other "household pets" a homeowner may have. *See Danaher*, 184 N.C. App. at 645, 646 S.E.2d at 785 (explaining restrictive covenants are to be strictly construed). The evidence of the relationship between Plaintiffs and the chickens is not in dispute, despite the number of chickens. Although Defendant considers the number of chickens "excessive," this is the subjective personal belief of the Board members and is not based upon the

restrictive covenants. And Mr. Frye testified the number of chickens was irrelevant to the Board; they considered even one chicken a violation of the covenants, as they believed poultry was banned entirely. We also note Defendant here did not raise any claim of other violations of the covenants or any concerns as to noise, odors, or other disturbances caused by the chickens, perhaps because the Plaintiffs lived on a 17-acre lot.

The only substantive differences between *Steiner* and this case are the type of animals and the details of how the goats and chickens were treated by their owners. *See generally Steiner*, 213 N.C. App. at 455, 713 S.E.2d at 520. Goats can be "livestock" in some circumstances, but they can also be "household pets" in other circumstances. *Id*. at 463, 713 S.E.2d at 525. Accordingly, the same interpretation of the covenant and definitions as used in *Steiner* applies here. A "pet" under these covenants is "a domesticated animal kept for pleasure rather than utility." *Id*. at 459, 713 S.E.2d at 522. Further, as in *Steiner*, a "household pet" is "a domesticated animal kept for pleasure of or relating to a family or social unit who live together in the same dwelling." *Id*. at 462, 713 S.E.2d at 524-25.

Defendant's Board members' interpretation of the covenants as a total prohibition on "poultry" as a "household pet" is simply not supported by the text of the covenants or the caselaw. *See Bryan*, 282 N.C. App. at 442, 871 S.E.2d at 565. In *Bryan v. Kittinger*, this Court interpreted a restrictive covenant substantially identical to Section 13 and its application to chickens. 282 N.C. App. at 437, 871

S.E.2d at 562. The *Bryan* case involved "the fate of four chickens and whether their presence in a residential planned community violates the private restrictive covenants governing that community." *Id.* at 436, 871 S.E.2d at 561. The operative language of the covenant in *Bryan* was: "No animals, livestock or poultry of any kind shall be raised, bred or kept on the building site, except that dogs, cats or other household pets may be kept, provided that they are not bred or maintained for any commercial purpose." *Id.* at 437, 871 S.E.2d at 562.

This Court held the trial court had erred by granting summary judgment to the plaintiff homeowners who sought to "enjoin Defendants from keeping the hens, claiming that their presence violated Sleepy Hollow's restrictive covenants prohibiting the keeping of 'poultry[.]'" *Id.* at 436, 871 S.E.2d at 561. The *Bryan* court stated:

> Because the first clause states that no "poultry of any kind" is allowed, the trial court concluded that Defendants' hens were in violation. But the court did not consider whether the fowl fell under the "household pets" language in the second clause.
>
> As we evaluate this 1998 covenant, we are cognizant of the following principles from our Supreme Court regarding the interpretation of private restrictive covenants:
>
> We are to give effect to the original intent of the parties. But if there is ambiguity in the language, the covenant is to be strictly construed in favor of the free use of land. This rule of strict construction is grounded in sound considerations of public policy: It is in the best interests of society that the free and unrestricted use and enjoyment of land be encouraged to its fullest extent. However, as

parties have the freedom to agree on restrictions in their neighborhood, the canon favoring the free use of land should not be applied in such a way as to defeat the plain and obvious purposes of a restriction.

Turning to the 1998 covenant, we conclude that the keeping of poultry is clearly forbidden by the covenant's first clause, as chickens are "poultry." However, we must determine whether the covenant's second clause could reasonably be construed to allow poultry if kept as "household pets." We conclude that it does: While the first clause forbids the keeping of any "animals," the second clause clearly allows the keeping of animals, so long as they are "household pets" and otherwise not used for a commercial purpose. In the same way, where the first clause forbids the keeping of "poultry," the second clause could be reasonably read to allow poultry—which, we note, are animals—kept as "household pets" and otherwise not kept for any commercial purpose.

*Id*. at 437-38, 871 S.E.2d at 562 (citations, quotation marks, and brackets omitted).

In *Bryan*, the trial court granted the plaintiffs' motion for summary judgment based on its determination that "chickens violated the covenants as a matter of law." *Id*. at 436, 871 S.E.2d at 561. This Court reversed because the forecast of evidence raised a genuine issue of fact as to whether the defendants "indeed keep their hens as household pets and not otherwise for any commercial purpose." *Id*. at 438, 871 S.E.2d at 563. In *Bryan*, the plaintiffs claimed the Kittingers' chickens were not treated as pets and were kept for the commercial purpose of selling eggs. *See id*. The *Bryan* court noted that the prohibition on "poultry" was not absolute but held the parties had raised genuine issues of material fact regarding whether the defendants kept the chickens for a commercial purpose. *Id*. In addition, the parties in *Bryan*

presented other claims and factual issues not present in this case regarding allegations of violations of other covenants and a private nuisance claim alleging "that [the d]efendants' owning of chickens prevents and interferes in the [p]laintiffs' lawful use and peaceful enjoyment of their property, and that said chickens create such noise as to interfere with the [p]laintiffs' sleep and rest . . . and as a result thereof the [p]laintiffs have incurred damages[.]" *Id.* at 442, n. 7, 871 S.E.2d 565, n. 7 (citation and quotation marks omitted).

Although we view the evidence "in the light most favorable to" Defendant and resolve any "contradictions, conflicts, and inconsistencies" in Defendant's favor, much of Defendant's evidence consisted of the opinions of the Board members that chickens are categorically "poultry" and not even one chicken is allowed to be kept on a lot under the covenants. *Ellis*, 156 N.C. App. at 194-95, 576 S.E.2d at 140 (citations, quotation marks, and brackets omitted). The evidence as to the facts in this case simply showed that Plaintiffs' chickens were "household pets" under the proper interpretation of the covenants. All the evidence showed the chickens were "a domesticated animal kept for pleasure of or relating to a family or social unit who live together in the same dwelling." *Steiner*, 213 N.C. App. at 462, 713 S.E.2d at 524-25 (citations, quotation marks, ellipses, and brackets omitted). Further, the number of chickens Plaintiffs had on the property cannot be used to show they are not household pets under the covenant, as the covenants made no such distinction. *See generally Erthal*, 223 N.C. App. at 380, 736 S.E.2d at 518. Based on a proper interpretation of

the covenants as a matter of law, the trial court should have granted Plaintiffs' motion for judgment notwithstanding the verdict on the issue of whether their chickens were "household pets." We now must consider whether the evidence presented any factual issue as to the question of whether the chickens were kept for commercial purposes.

## E. Evidence regarding Commercial Purposes

Although the jury did not reach the question of whether the Plaintiffs maintained their chickens for a commercial purpose based on their answer to the first issue on the verdict sheet, Plaintiffs argue that the trial court should have directed a verdict in their favor on this issue as well. The only evidence Defendant argued that could be construed as tending to show a commercial purpose is evidence Plaintiffs may have sold some eggs. The entire presentation of evidence consisted of a 2019 social media post by Mrs. Schroeder stating that she "sells farm fresh eggs" and wanted to find a place to donate surplus eggs. Defendant's own witnesses acknowledged they were not aware of any evidence Plaintiffs actually sold any eggs. Further, Mrs. Schroeder denied ever selling any eggs.

But even if we assume Mrs. Schroeder actually sold eggs, as indicated in her social media post, this evidence would not be sufficient to demonstrate a "commercial purpose" as a matter of law. *See generally J. T. Hobby & Son, Inc. v. Fam. Homes of Wake Cnty., Inc.*, 302 N.C. 64, 74-75, 274 S.E.2d 174, 181 (1981). The cases regarding interpretation of restrictive covenants addressing a prohibition of a "commercial

purpose" for use of property show merely receiving income from the use of the property is not sufficient to show a "commercial purpose" where the restrictive covenants give no further guidance on the meaning of this term. *See, e.g., id.*

In *J. T. Hobby & Son*, our Supreme Court addressed the interpretation and application of a restrictive covenant stating that "no lot may be used 'except for residential purposes.'" *Id.* at 75, 274 S.E.2d at 181. The defendant was a non-profit corporation which owned and operated a family care home where four handicapped adults lived with a "married couple who serve as resident managers of the facility." *Id.* at 72, 274 S.E.2d at 179-80. The plaintiff contended the defendant's family care home was an "institutional use" of the home which generated income as a business and argued it was "analogous to a boarding house, such usage having been widely held to violate restrictive covenants requiring that real property be utilized for residential purposes only." *Id.* at 71, 274 S.E.2d at 179. The Supreme Court rejected this argument and held that the Court of Appeals erred "in concluding that the restrictive covenant was violated by the 'institutional' use of the property by defendant[.]" *Id.* at 70, 274 S.E.2d at 179.

The *Hobby* Court first noted

> a fundamental premise of the law of real property. While the intentions of the parties to restrictive covenants ordinarily control the construction of the covenants, such covenants are not favored by the law, and they will be strictly construed to the end that all ambiguities will be resolved in favor of the unrestrained use of land. The rule of strict construction is grounded in sound considerations

> of public policy: It is in the best interests of society that the free and unrestricted use and enjoyment of land be encouraged to its fullest extent.

*Id*. at 70-71, 274 S.E.2d at 179.

The Supreme Court recognized the defendant was a non-profit corporation and its "services at the family care home are not rendered gratuitously." *Id*. at 72, 274 S.E.2d at 180. The family care home received operating funds from "government grants and receipts from the residents themselves" and the "resident managers are compensated for their services." *Id*. But the Supreme Court stated the "on-going economic exchange" required for the operation of the family care home was "an insubstantial consideration." *Id*. Although the family care home did

> not comport in all respects with the traditional understanding of the scope of the term "residential purposes", its essential purpose, when coupled with the manner in which defendant seeks to achieve its stated goals, clearly brings it within the parameters of residential usage as contemplated by the framers of the restrictive covenant which is at issue in this case.

*Id*. at 71-72, 274 S.E.2d at 179. The essential purpose of the family care home was to provide a home for its disabled residents so they would be able to live in a home where the "day-to-day activities" of its residents were not "significantly different from that of neighboring houses except for the fact that" most of its residents were disabled. *Id*. at 72, 274 S.E.2d at 180.

The *Hobby* Court specifically noted the defendant's receipt of compensation for the family care home's services did not "render its activities at the home commercial

in nature."

> While it is obvious that the home would not exist if it were not for monetary support being provided from some source, that support clearly is not the objective behind the operation of this facility. That defendant is paid for its efforts does not detract from the essential character of its program of non-institutional living for [those with special needs]. Clearly, the receipt of money to support the care of more or less permanent residents is incidental to the scope of defendant's efforts. In no way can it be argued that a significant motivation behind the opening of the group home by defendant was its expectation of monetary benefits.

*Id*. at 73, 274 S.E.2d at 180.

Here, even if we assume Plaintiffs sold eggs, there is no evidence that "a significant motivation behind" Plaintiffs acquiring and keeping chickens on their lot was their "expectation of monetary benefits." *Id*. The evidence was undisputed that the "objective" behind the "operation of" Plaintiffs keeping chickens was their own personal enjoyment of keeping chickens as pets. *Id*.

In *Russell v. Donaldson*, this Court addressed an issue of first impression: whether use of the defendants' home for short-term vacation rentals violated a restrictive covenant that "[n]o lots shall be used for business or commercial purposes." 222 N.C. App. 702, 703, 731 S.E.2d 535, 537 (2012). This Court affirmed the trial court's grant of summary judgment for the defendants. *Id*. at 706-07, 731 S.E.2d at 539. The *Russell* court noted that,

> [t]he covenant at issue states, "No lots shall be used for business or commercial purposes[.]" We must determine if

defendants' rental activity qualifies as a business or commercial purpose in violation of the covenant. We look to the natural meaning of "business or commercial purposes[.]" In the instant case, the restrictive covenant and the surrounding context fail to define "business or commercial purpose." Plaintiff suggests looking at other North Carolina statutes to provide definitions of ambiguous words in the covenant. Plaintiff does not cite any authority in support of this proposition. Rather, when covenants are ambiguous, as in the instant case, all ambiguities will be resolved in favor of the unrestrained use of the land.

. . . .

Our prior cases in North Carolina have dealt with "affirmative" covenants requiring the use of land for residential purposes. Plaintiff cites us to *Walton v. Carignan*, 103 N.C.App. 364, 407 S.E.2d 241 (1991). However, the instant case deals with a "negative" covenant, prohibiting the use of land for business or commercial purposes. We hold that the cases cited by plaintiff are not sufficiently similar to the instant case to be binding authority. In the absence of persuasive and binding North Carolina cases, we examine the law of other states.

*Id.* at 705-06, 731 S.E.2d at 538 (citations and quotation marks omitted). After

examining several cases from other states, the *Russell* court held that

[u]nder North Carolina case law, restrictions upon real property are not favored. Ambiguities in restrictive covenants will be resolved in favor of the unrestricted use of the land. A negative covenant, prohibiting business and commercial uses of the property, does not bar short-term residential vacation rentals.

*Id.* at 706-07, 731 S.E.2d at 539.

The covenant here is also a negative covenant, allowing landowners to keep

animals including horses, dogs, cats, and other household pets if they "are *not* kept, bred, or maintained for any commercial purpose." (Emphasis added.) Here, as in *Russell*, "the restrictive covenant and the surrounding context fail to define" the term "commercial purpose." *Id.* at 705, 731 S.E.2d at 538. *Russell* again stresses that restrictive covenants must be construed strictly, and any ambiguity must be "resolved in favor of the unrestrained use of land." *Id.* Although short-term vacation rentals generated rental income for the owners of the property, this receipt of income did not transform the landowner's use of their home to a prohibited "commercial purpose." *Id.* at 707, 731 S.E.2d at 539. Here, even assuming Plaintiffs sold eggs, evidence of their sale of eggs alone is not sufficient to create a jury question as to a "commercial purpose" for their keeping and maintaining chickens on the lot. Based upon the proper interpretation of the covenants as a matter of law and the absence of evidence of a commercial purpose for the keeping of the chickens, the trial court should also have allowed Plaintiffs' motion for JNOV on this issue as well.

**F. Summary**

The trial court did not interpret the covenants as a matter of law but instead presented the issues to the jury as issues of fact with no instructions of law on the proper legal interpretation of the covenants or the definitions to be used. But since there was not even a scintilla of evidence that Plaintiffs' chickens were not household pets or that Plaintiffs had any commercial purpose for keeping the chickens, we conclude Plaintiffs directed verdict and JNOV should have been allowed. Plaintiffs

make other arguments on appeal regarding issues such as exclusion of evidence and jury instructions, and the arguments of both Plaintiffs and Defendant illustrate the basic legal error in the trial court's failure to interpret the covenants as a matter of law. But as we have determined the case should have never reached a jury on the issues presented, we need not address those arguments further.

### III.    Conclusion

For the reasons discussed above, the restrictive covenants did not prohibit Plaintiffs from having chickens kept as household pets on their property and based upon a proper interpretation of the covenants, the trial court should have allowed Plaintiffs' directed verdict and JNOV. We reverse the judgment and remand for entry of judgment in favor of Plaintiffs.

REVERSED and REMANDED.

Judges WOOD and GRIFFIN concur.