RICHARD STEINER AND WIFE TINA STEINER, PLAINTIFFS v. WINDROW ESTATES HOME OWNERS ASSOCIATION, INC., DEFENDANT

No. COA10-865

(Filed 19 July 2011)

**1. Animals— goats—restrictive covenants—household pets instead of livestock**

The trial court did not err in a declaratory judgment action by granting summary judgment in favor of plaintiff based on its conclusion that plaintiff's two goats were household pets and not livestock under a neighborhood's restrictive covenants. The goats were kept for pleasure rather than for profit or utility.

**2. Associations— restrictive covenants—nuisance—vague**

A neighborhood's board of directors abused its discretion by determining that plaintiffs' goats were a nuisance. The neighborhood's restrictive covenants did not provide sufficient guidance or definitions to permit any sort of objective determination, and thus, were too vague.

Appeal by defendant from order entered 23 February 2010 by Judge Timothy M. Smith in District Court, Mecklenburg County. Heard in the Court of Appeals 14 December 2010.

*Hamilton Moon Stephens Steele & Martin, PLLC, by M. Aaron Lay, for plaintiff-appellees.*

*Sellers, Hinshaw, Ayers, Dortch & Lyons, P.A., by Michelle Price Massingale, for defendant-appellant.*

STROUD, Judge.

Defendant appeals a summary judgment order in a declaratory judgment action which determined that plaintiffs could keep the goats, Fred and Barney, on their property. For the following reasons, we affirm.

I. Background

On or about 8 May 2009, plaintiffs filed a declaratory judgment action pursuant to N.C. Gen. Stat. § 1-253 *et. seq.* seeking a declaration that certain restrictive covenants upon their real property ("Property") were not enforceable against them. Plaintiffs alleged

STEINER v. WINDROW ESTATES HOME OWNERS ASS'N, INC.

[213 N.C. App. 454 (2011)]

that they owned Property in a subdivision known as Windrow Estates, which is subject to "certain restrictive covenants set forth in the Declaration of Covenants, Reservations, and Restrictions filed with the Mecklenburg County Register of Deeds in Deed Book 3601, Page 373 ("Restrictive Covenants") . . . ." Plaintiffs further alleged that defendant

> Windrow HOA[, defendant Windrow Estates Home Owners Association, Inc.,] is empowered to enforce the Restrictive Covenants and provide rules and regulations for common properties within Windrow Estates and assess each property owner for upkeep of said common properties.

> 6. Windrow Estates is an equestrian community and many property owners within the subdivision pasture and keep horses on their lots and have built stables for the same.

> . . . .

> 8. On or about September 17, 2008, the Steiners purchased two male Nigerian Dwarf Goats as pets for themselves and their children and named them Fred and Barney (the "Pet Goats").

> . . . .

> 16. On or about April 15, 2009, the Executive Board of the Windrow HOA (the "Board"), following a hearing regarding the Pet Goats, informed the Steiners that the Board had determined that the Steiners, by keeping the Pet Goats on the Property, were in violation of the Restrictive Covenants, specifically numbers 6 and 9. . . .

> 17. Restrictive Covenant 6 states: "No offensive or noxious activity shall be carried on upon any lot, nor shall anything be done thereon tending to cause embarrassment, discomfort, annoyance, or nuisance to the neighborhood. There shall not be maintained any plants or animals, or device or thing of any sort whose normal activity or existence is in any way noxious, unsightly, unpleasant or of a nature as may diminish or destroy the enjoyment of other property in the neighborhood by the owners thereof; except horses and stables may be maintained, but every effort must be made to reduce the stable odors."

> 18. Restrictive Covenant 9 states: "No animals, livestock or poultry of any kind shall be raised, bred or kept on any lot except that horses, dogs, cats or other pets may be kept provided they

are not kept, bred, or maintained for any commercial purposes, unless allowed by Windrow Estates Property Owners' Association, and provided that such household pets do not attack horses or horsemen."

Plaintiffs requested a declaratory judgment declaring that plaintiffs,

by keeping the Pet Goats on the Property, are not in violation of the Restrictive Covenants, that the Pet Goats are within the meaning of the "pet" exception within the Restrictive Covenants, and that the Pet Goats' normal activity or existence is not noxious, unsightly, unpleasant or of a nature as may diminish or destroy the enjoyment of other property in Windrow Estates by the owners thereof[.]

On 6 July 2009, defendant answered plaintiffs' complaint and counterclaimed for a declaratory judgment declaring, *inter alia,*

that goats are not permitted to be kept on any Lot under the terms and conditions of the [Restrictive Covenants];

4. That the Court enter judgment declaring that "goats" are livestock;

. . . .

6. That the Court enter judgment declaration [sic] that the Association was within its discretion in concluding that the maintaining of goats on Plaintiffs' property violates Paragraphs 6 and 9 of the [Restrictive Covenants].

On 21 August 2009, plaintiffs replied to defendant's counterclaim. On 27 January 2010, plaintiffs and defendant filed motions for summary judgment. On 23 February 2010, the trial court, *inter alia,* granted plaintiff's motion for summary judgment and permitted Fred and Barney "to be kept on plaintiffs' Lot within Windrow Estates." Defendant appeals.

## II. Standard of Review

We first note that although this case is based upon action taken by the Board against plaintiffs pursuant to the Restrictive Covenants of Windrow Estates, it is not an appeal arising from the Board's decision, but rather is a declaratory judgment action, both as to plaintiffs' claim and defendant's counterclaim.

Summary judgment may be granted in a declaratory judgment proceeding where the pleadings, depositions, answers to inter-

rogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law . . . . On appeal, this Court's standard of review involves a two-step determination of whether (1) the relevant evidence establishes the absence of a genuine issue as to any material fact, and (2) either party is entitled to judgment as a matter of law.

*Prod. Sys., Inc. v. Amerisure Ins. Co.*, 167 N.C. App. 601, 604, 605 S.E.2d 663, 665 (2004) (citations and quotation marks omitted); *disc. review denied*, 359 N.C. 322, 611 S.E.2d 416 (2005).

### III. Restrictive Covenants

Both plaintiffs and defendant argue that there is no issue of fact, but that they are entitled to judgment as a matter of law. Defendant argues that the trial court erred in concluding that (1) Fred and Barney are "household pets" pursuant to paragraph 9 of the Restrictive Covenants, and (2) the Board abused its discretion in determining Fred and Barney are a nuisance pursuant to paragraph 6 of the Restrictive Covenants.

We first review the principles that guide our analysis of restrictive covenants. The word covenant means a binding agreement or compact benefitting both covenanting parties. Covenants accompanying the purchase of real property are contracts which create private incorporeal rights, meaning non-possessory rights held by the seller, a third-party, or a group of people, to use or limit the use of the purchased property. Judicial enforcement of a covenant will occur as it would in an action for enforcement of any other valid contractual relationship. Thus, judicial enforcement of a restrictive covenant is appropriate at the summary judgment stage unless a material issue of fact exists as to the validity of the contract, the effect of the covenant on the unimpaired enjoyment of the estate, or the existence of a provision that is contrary to the public interest.

. . . .

*[W]hile the intentions of the parties to restrictive covenants ordinarily control the construction of the covenants, such covenants are not favored by the law, and they will be strictly construed to the end that all ambiguities will be resolved in favor of the unrestrained use of land.* The rule of strict construction is grounded in sound considerations of public policy: It

**STEINER v. WINDROW ESTATES HOME OWNERS ASS'N, INC.**

[213 N.C. App. 454 (2011)]

is in the best interests of society that the free and unrestricted use and enjoyment of land be encouraged to its fullest extent.

*The law looks with disfavor upon covenants restricting the free use of property. As a consequence, the law declares that nothing can be read into a restrictive covenant enlarging its meaning beyond what its language plainly and unmistakably imports.*

Covenants restricting the use of property are to be strictly construed against limitation on use, and will not be enforced unless clear and unambiguous. This is in accord with general principles of contract law, that the terms of a contract must be sufficiently definite that a court can enforce them. Accordingly, courts will not enforce restrictive covenants that are so vague that they do not provide guidance to the court.

. . . *Unless the covenants set out a specialized meaning, the language of a restrictive covenant is interpreted by using its ordinary meaning.*

*Wein II, LLC v. Porter*, 198 N.C. App. 472, 479-80, 683 S.E.2d 707, 712-13 (2009) (emphasis added) (citations, quotation marks, ellipses, and brackets omitted).

A. Paragraph 9 of the Restrictive Covenants

**[1]** Defendant first contends that the trial court erred in concluding Fred and Barney are "household pets" pursuant to paragraph 9 of the Restrictive Covenants. Regarding paragraph 9 of the Restrictive Covenants the trial court determined that

4. Plaintiffs' Nigerian Dwarf goats  respectively named Fred and Barney ("Nigerian Dwarfs") are Plaintiffs' household pets;

5. Plaintiffs' Nigerian Dwarfs are not livestock;

6. Because the Nigerian Dwarfs are not livestock and are household pets, Plaintiffs, by keeping the Nigerian Dwarfs on their Lot, are not in violation of Paragraph 9 of the [Restrictive Covenants.]

Paragraph 9 of the Restrictive Covenants provides:

No animals, livestock or poultry of any kind shall be raised, bred or kept on any lot except that horses, dogs, cats or other

**STEINER v. WINDROW ESTATES HOME OWNERS ASS'N, INC.**

[213 N.C. App. 454 (2011)]

pets may be kept provided they are not kept, bred, or maintained for any commercial purposes, unless allowed by Windrow Estates Property Owners' Association, and provided that such household pets do not attack horses or horsemen.

Defendant's arguments on appeal primarily focus on the meaning and interpretation of the words "livestock[,]" "pets[,]" and "household pets[,]" and the purpose and intent of the Restrictive Covenants. As the Restrictive Covenants do not define any of these words, we must use the "ordinary meaning" of the words. *See id.* at 480, 683 S.E.2d at 713. "Livestock" is defined as "animals kept or raised for use or pleasure; *esp* : farm animals kept for use and profit[.]" Merriam-Webster's Collegiate Dictionary 728 (11th ed. 2003). Merriam-Webster's Collegiate Dictionary defines a "pet," *inter alia,* as "a domesticated animal kept for pleasure rather than utility[.]"[1] *Id.* at 926. Thus, the distinguishing feature between "livestock" and a "pet" is that "livestock" is primarily "kept for use and profit" while a "pet" is "kept for pleasure[.]" *Id.* at 728, 926.

1. Livestock

Defendant contends that "[t]he [Restrictive Covenants] at issue ha[ve] a specific restriction on livestock, which includes goats."[2] Defendant then directs our attention to legal definitions of "livestock[,]" including the Matthews Town Ordinance. However, legal definitions of "livestock" are not controlling in our analysis; here, the Restrictive Covenants did not provide a definition of the word "livestock[,]" nor did the Restrictive Covenants refer to or incorporate any legal definitions such as the Matthews Town Ordinance, and thus we are bound by the "ordinary meaning" of the word. *See Wein, II,* at 480, 683 S.E.2d at 713. *Id.* If the drafters of the Restrictive Covenants intended to use the definition of "livestock" as provided by the Town of Matthews they could have simply drafted this into the Restrictive Covenants. "[N]othing can be read into a restrictive covenant enlarging its meaning beyond what its language plainly and unmistakably imports[,]" and therefore we consider the "ordinary meaning" of the word "livestock[.]" *Id.*

---

1. A "domestic animal" is "any of various animals (as the horse or sheep) domesticated so as to live and breed in a tame condition[.]" *Id.* at 371. There is no dispute that Fred and Barney are domesticated animals.

2. We do note the fact that a type of animal could under certain circumstances be classified as "livestock" does not necessarily bar the animal under paragraph 9 of the Restrictive Covenants. Paragraph 9 of the Restrictive Covenants essentially allows any animal which qualifies as a "household pet[,]" is "not kept, bred, or maintained for any commercial purposes," and does "not attack horses or horsemen."

The facts regarding Fred and Barney and their relationship to plaintiffs are not disputed by defendant. Mrs. Tina Steiner's affidavit states as follows:

8. In 2008, I was diagnosed with melanoma, a form of skin cancer. I began undergoing treatment for the cancer. During this time, I was also being treated and under medical supervision for heart disease and was later diagnosed [with] asthma.

9. As a result of the stress emanating from these medical conditions and events in my personal life, as well as the advice of my physician, I decided to buy comfort pets to help me cope and aid in my recovery.

10. After much research, I decided to purchase Dwarf Nigerian Goats as comfort pets that could be kept in the same area as my horses and were known to adapt well and live in close confines with horses.

11. On or about September 17, 2008, Richard and I purchased two male Nigerian Dwarf Goats as pets for myself and our children from Peach Tree Farms ("Peach Tree") in Oakboro, North Carolina. Peach Tree Farms breeds and raises registered Nigerian Dwarf Goats for sale solely as pets.

12. My family and I named the two Nigerian Dwarfs Fred and Barney, respectively.

13. When we purchased Fred and Barney from Peach Tree, they had already been neutered and disbudded, i.e., their horns had been removed. As Fred and Barney have been neutered, they are unable to breed and, as males, they do not produce any milk. Moreover, there is no market for their meat in the United States. Fred and Barney do not, and cannot, serve any commercial purpose other than resale. We purchased Fred and Barney solely as pets and for our enjoyment.

. . . .

15. Since bringing Fred and Barney home from Peach Tree, we have kept them on our Property. Fred and Barney primarily stay in the corralled area where we keep the horses.

. . . .

17. Fred and Barney are treated much like our family's pet dogs and interact with our family in a very similar manner. Fred

and Barney are very affectionate, gentle, and make great companions. Much like our family's dogs, Fred and Barney walk on a leash in our yard, sit in our laps, follow us around in their enclosure and in the yard, tug at our clothes to be petted or to jump in our arms, swing with us on our outdoor swing, retrieve their brush and bring it to us to be brushed, retrieve and bring back balls when thrown, travel in a dog carrier placed in our car when taken to the vet, play with my kids, beg for treats, and answer and come to us when we call their respective names of Fred or Barney.

18. Fred and Barney, together, while at our Property, slept in an "Igloo Dog House" of medium size that is placed within the stable of the Property. When it was cold at night, I took blankets and tucked them in and/or put coats on them to protect them from the cold air.

19. I regularly buy items from local pet stores for Fred and Barney, including their leashes, collars, brushes, treats, bedding, dog house, and medicines.

20. I have developed a love and bond with Fred and Barney that is as strong as or stronger than that which I have had with any other pet. Fred and Barney are always affectionate with me and appear excited to see me. They provide me comfort no matter how badly I feel or how much stress I am enduring at any given time. Fred and Barney have allowed me to better deal with my various medical conditions and the stresses that result from my health and personal challenges.

21. Fred and Barney are well behaved and interact well with people and other animals. Our friends, neighbors, and other children regularly petted and played with Fred and Barney when visiting our home. My children play with Fred and Barney and I have never had a concern about Fred or Barney harming my children. Fred and Barney have never caused harm or attempted to cause harm to our horses or any neighborhood pets, including the occasional wayward dog or passing horse.

Mrs. Steiner's affidavit demonstrates that she viewed and treated her goats as pets rather than as livestock. *See generally* Merriam-Webster's Collegiate Dictionary at 728, 926. Mrs. Steiner attested: Fred and Barney were purchased as "comfort pets[;]" have no "commercial purpose other than resale[;]" "Fred and Barney are treated much like [the] family's pet dogs and interact with [the] family in a very similar manner[;]" Mrs. Steiner has "a love and bond with Fred

and Barney that is as strong as or stronger than that which [she] ha[s] had with any other pet." Again, Fred and Barney's relationship to plaintiffs is not disputed. There is thus no genuine issue of fact as to Fred and Barney's relationship to plaintiffs. As it is undisputed that Fred and Barney were kept for pleasure rather than for profit or utility, they are pets and not livestock under paragraph 9 of the Restrictive Covenants. *See id.*

2. Household Pets

Defendant next contends that because "the goats are not kept in the house, but instead outside with [the] horses . . . . [they] are not household pets."[3] We first note that the word "household" may be either a noun or an adjective; *see id.* at 602, here it is used as an adjective, modifying the word "pet." While Merriam-Webster's Collegiate Dictionary does not define "household pet," it does define "household" as an adjective in pertinent part as "of or relating to a household : DOMESTIC[.]" *Id.* at 602. Thus, the adjective definition of "household" requires that one consider the noun definition of "household." *See id.* "Household" as a noun is defined as "those who dwell under the same roof and compose a family; *also* : a social unit composed of those living together in the same dwelling[.]" *Id.* Therefore, when we put all of the relevant definitions together, we see that a "household pet" is "a domesticated animal kept for pleasure" "of or relating to a" "family . . . [or] social unit [who live] together in the same dwelling[.]" *See id.* at 602, 926.

Despite defendant's argument, we do not find the fact that the goats do not literally live *inside* the house to be dispositive of the issue. First, the "ordinary meaning" of the adjective "household" requires that something be "of or relating to" the household, not actually inside of the house. *See Wein, II* at 480, 683 S.E.2d at 713; Merriam-Webster's Collegiate Dictionary at 602. This definition is consistent with a practical and commonsense understanding of the term "household pet." Many pet owners keep their dogs in a pen in the backyard and do not permit them into the house; many pet owners

---

3. Both plaintiffs and defendant cite to *Town of Atlantic Beach v. Young,* 58 N.C. App. 597, 293 S.E.2d 821 (1982), *rev'd and remanded,* 307 N.C. 422, 298 S.E.2d 686 (1983), for the definition of "household pet." However, the "household pet" test both parties cite is in a Court of Appeals opinion which was reversed by the Supreme Court. *See id.,* 307 N.C. 422, 298 S.E.2d 686; *id.,* 58 N.C. App. at 599, 293 S.E.2d at 822-23. Though the Supreme Court did not explicitly overrule the test, it did overrule this Court on the "household pet" issue. *See id.,* 307 N.C. 422, 298 S.E.2d 686. Furthermore, the test enumerated in this Court's decision uses a dictionary definition, and thus is practically the same analysis we are conducting here. *See id.,* 58 N.C. App. at 599, 293 S.E.2d at 822-23.

have a cat which lives outside and may more often than not be found wandering in a neighbor's yard rather than its own, yet these animals are most certainly considered "household pets" by their respective owners. Fred and Barney "walk on a leash in [the Steiners'] yard[;]" follow [the Steiners] around in their enclosure and in the yard[;]" and sleep "in an 'Igloo Dog House' of medium size that is placed within the stable of the Property." Again, defendants do not challenge the facts as to Fred and Barney's living conditions and relationship to the plaintiffs. We conclude that there is no issue of material fact that Fred and Barney are "household pets" within the meaning of paragraph 9 of the Restrictive Covenants. Had the drafters of the Restrictive Covenants wished to limit the definition of "household pets" to animals more traditionally considered as pets, such as dogs and cats, they certainly may have done so; instead the Restrictive Covenants expands the variety of animals which may be considered as pets by allowing for "other pets[,]" which in this instance includes the goats Fred and Barney.

## 3. Purpose and Intent of the Restrictive Covenants

Lastly, as to paragraph 9 of the Restrictive Covenants, defendant contends that "[t]he [p]urpose and [i]ntent of the [Restrictive Covenants] is [l]imited to [t]wo [h]orses [a]nd an [e]questrian [c]ommunity, [n]ot a [f]arm."

> Not only do[] the [Restrictive Covenants] contain a restriction on livestock and other outside animals, it also restricts the number of horses an Owner is permitted to have on the lot. When reading this limitation in conjunction with the nuisance provision in Paragraph 6 and the pet provision in Paragraph 9, the intent of the [Restrictive Covenants] is to limit the odors, as well as the numbers and types of pets in the community.[4]

Defendant further notes that "when reading the Restrictive Covenants as a whole, farm animals such as goats were not intended to be included in the 'household pet' exception."

Again,

> while the intentions of the parties to restrictive covenants ordinarily control the construction of the covenants, such covenants are not favored by the law, and they will be strictly construed

---

4. We find defendant's argument regarding the "odors" produced by two very small goats somewhat perplexing, as very similar and arguably much larger "odors" would be produced by two horses, which are specifically allowed by the Restrictive Covenants.

to the end that all ambiguities will be resolved in favor of the unrestrained use of land. . . . [T]he law declares that nothing can be read into a restrictive covenant enlarging its meaning beyond what its language plainly and unmistakably imports.

Covenants restricting the use of property are to be strictly construed against limitation on use, and will not be enforced unless clear and unambiguous.

*See Wein, II* at 480, 683 S.E.2d at 713.

Here, the Restrictive Covenants are so broad as to allow for virtually any animal which may be treated as a "household pet" to be kept on the homeowner's property, so long as the animal is "not kept, bred, or maintained for any commercial purposes" and does "not attack horses or horsemen."[5] If the intent and purpose of the Restrictive Covenants was to prevent goats or other similar animals from being kept on the property, it certainly could have forbidden specific types of animals or provided specific definitions for material terms such as "household pets[.]" Instead, the Restrictive Covenants must be construed pursuant to the "ordinary meaning" of the words used, *id.*, and under this construction, Fred and Barney are plaintiffs' household pets. *See* Merriam-Webster's Collegiate Dictionary at 602, 926.

Furthermore, defendant has not demonstrated how Fred and Barney's presence inhibits or contradicts the Restrictive Covenants' stated purpose of "keeping with the intention of the developer to create an equestrian community[.]" "[E]questrian" is defined as "of, relating to, or featuring horseback riding[.]" Although there is no dispute that horses are specifically allowed by the Restrictive Covenants, and the presence of horses would make the community "equestrian[,]" this term alone does not exclude any other types of animals from the community. In fact, the only types of animals which appear to be categorically excluded by the Restrictive Covenants are those that are "kept, bred, or maintained for any commercial purposes" or may "attack horses or horsemen." Accordingly, we conclude that pursuant to paragraph 9 of the Restrictive Covenants Fred and Barney are not livestock; they are household pets; and their presence on the Property does not inhibit or contradict the stated intent and purpose of the Restrictive Covenants to establish an "equestrian community[.]" Thus, the trial court did not err in granting summary judgment for

5. There is no allegation that Fred and Barney pose any danger to "horses or horsemen." In fact, Mrs. Steiner's affidavit states that she choose Dwarf Nigerian Goats because they "were known to adapt well and live in close confines with horses."

plaintiff as to this issue and declaring that Fred and Barney are household pets and are not livestock, and that as such plaintiffs had not violated paragraph 9 of the Restrictive Covenants. This argument is overruled.

B. Paragraph 6 of the Restrictive Covenants

[2] Defendant next contends that the "board of directors did not abuse its discretion when it determined that plaintiffs-appellees' goats are a nuisance and therefore violate paragraph 6 of the [Restrictive Covenants.]" (Original in all caps.) As to paragraph 6 of the Restrictive Covenants the trial court determined:

> 7. The Board of Directors abused its discretion in determining that Plaintiffs' Nigerian Dwarfs are a nuisance and prohibited under Paragraph 6 of the [Restrictive Covenants;]
>
> 8. Because Plaintiffs' Nigerian Dwarfs are not a nuisance, Plaintiffs, by keeping the Nigerian Dwarfs on their Lot, are not in violation of Paragraph 6 of the [Restrictive Covenants.]

Paragraph 6 provides:

> No offensive or noxious activity shall be carried on upon any lot, nor shall anything be done thereon tending to cause embarrassment, discomfort, annoyance, or nuisance to the neighborhood. *There shall not be maintained any plants or animals, or device or thing of any sort whose normal activity or existence is in any way noxious, dangerous, unsightly, unpleasant or of a nature as may diminish or destroy the enjoyment of other property in the neighborhood by the owners thereof;* except that horses and stables may be maintained, but every effort must be made to reduce stable odors.

(Emphasis added).

We again note the confusion raised by the unusual legal posture of this case as a declaratory judgment action which requested a review of the Board's discretion and not actually a review of the action of the Board.[6] Yet we need not address defendant's contentions as we conclude that paragraph 6 of the Restrictive Covenants is void for vagueness. *See Property Owner's Assoc. v. Seifart,* 48 N.C. App. 286, 297, 269 S.E.2d 178, 184 (1980) (affirming

---

6. Defendant's counterclaim requested a judgment declaring "that the Association was within its discretion in concluding that the maintaining of goats on Plaintiffs' property violates Paragraphs 6 and 9 of the [Restrictive Covenants]."

the trial court's order granting summary judgment in favor of property owners rather than the property owner's association because the covenants provided "no sufficient basis for the court to decree enforcement of the assessments"). In fact,

> there is little case law addressing the question of what language in a restrictive covenant is void for vagueness, and what language is not. It appears that we have not dealt with this void for vagueness question because our courts usually supply a definition for an undefined term in a covenant rather than void the entire covenant. Unless the covenants set out a specialized meaning, the language of a restrictive covenant is interpreted by using its ordinary meaning.

*Wein, II*, 198 N.C. App. at 480, 683 S.E.2d at 713 (citation, quotation marks, ellipses, and brackets omitted). We are thus left to consider the "ordinary meaning" of the words used by paragraph 6. *See id.*

Here, paragraph 6 of the Restrictive Covenants focuses on the subjective emotions or feelings of "embarrassment, discomfort, annoyance, or nuisance" experienced by "the neighborhood." The definition of things or activities proscribed by paragraph 6 of the Restrictive Covenants is expanded to cover that which "is in any way noxious, dangerous, unsightly, unpleasant or of a nature as may diminish or destroy the enjoyment of other property in the neighborhood by the owners thereof." We do not think it necessary here to cite specific dictionary definitions of the operative words: embarrassment, discomfort, annoyance, nuisance, noxious, unsightly, and unpleasant;[7] each of these words describes a subjective and personal experience or feeling.[8] Just as beauty is in the eye of the beholder, each of these terms can be defined only from the perspective of the beholder. *See generally Coates v. Cincinnati*, 402 U.S. 611, 614, 29 L. Ed. 2d 214, 217 (1971) ("Conduct that annoys some people does not annoy others. Thus, the ordinance is vague, not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all. As a result, men of common intelligence must necessarily guess at its meaning." (citation and quotation marks omitted)). The Restrictive Covenants do not give

7. We exclude the word "dangerous" from this list of prohibitions from paragraph 6 of the Restrictive Covenants because "dangerous" may be objectively defined and is not based upon an emotion or feeling; however, there is no allegation that Fred and Barney are "dangerous[.]"

8. We also note that "nuisance" as used here must be construed using its "ordinary meaning" and not a legal definition. *See id.*

sufficient guidance or definitions to the aforementioned terms to permit us to make any sort of legal determination as to what they mean or should mean to the Windrow Estates neighborhood. Under paragraph 6 of the Restrictive Covenants, the emotional reaction of annoyance of a property owner could be the basis for making an activity a violation of the covenants; as a practical matter, the Board could prohibit anything which might "annoy" even one resident of the subdivision, such as loud and rambunctious children playing in the yard; use of a noisy power mower to cut the grass; blinking Christmas lights; or any pet who may dig in a neighbor's flowerbed, bark, leave footprints on a car, or visit the property of another property owner for any reason. Things and activities such as these have certainly at times caused "embarrassment, discomfort, [or] annoyance" to someone or have been viewed as "unsightly, unpleasant or of a nature as may diminish or destroy the enjoyment of other property[.]" Certain property owners in Windrow Estates consider Fred and Barney to be annoying, noxious, and unpleasant; plaintiffs consider them adorable and lovable. The Restrictive Covenants as written do not provide sufficient guidance or definitions to permit the Board, or a court, to make any sort of objective determination of who is right, and this is the essence of vagueness.

Defendant contends that plaintiffs have not properly raised the issue of vagueness on appeal. Although the trial court did not conclude that paragraph 6 of the Restrictive Covenants was void for vagueness and instead based its ruling upon a determination of an abuse of discretion by the Board,[9] we may consider this argument because plaintiffs presented this issue as a ground for summary judgment before the trial court. This Court may consider all the evidence and arguments before the trial court in its *de novo* review of whether summary judgment is appropriate. *See Miller v. First Bank*, —— N.C. App. ——, ——, 696 S.E.2d 824, 827 (2010). Although the trial court did not state that vagueness was part of the reason for its ruling, we may affirm the trial court's ruling for any reason presented before it which is supported by the evidence and law. *See generally Shore v. Brown*, 324 N.C. 427, 428, 378 S.E.2d 778, 779 (1989) ("If the granting of summary judgment can be sustained on any grounds, it should be affirmed on appeal."). Accordingly, the trial court properly granted

---

9. We note that the "abuse of discretion" language in the trial court's order is referring to a review of the Board's determination that plaintiffs had violated paragraph 6 of the Restrictive Covenants, but as noted above, this is a declaratory judgment action and not a review of the Board's prior action.

summary judgment as to any issues regarding paragraph 6 of the Restrictive Covenants. This issue is overruled.

## IV. Conclusion

In conclusion, we affirm the trial court's order granting summary judgment in favor of plaintiffs.

AFFIRMED.

Judges BRYANT and BEASLEY concur.