IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-912

Filed 1 October 2025

Ashe County, No. 22CVS000061-040

BIBIANA VILLAZON, Plaintiff,

v.

SAMUEL ALAN OSBORNE and SAMANTHA HAMBY, Defendants and Counterclaim Plaintiffs,

v.

MICHAEL SKINNER, Third-Party Defendant.

Appeal by defendants from order entered 13 December 2022 by Judge Richard S. Gottlieb, order entered 17 March 2023 by Judge Gregory R. Hayes, and judgment entered 3 January 2024 by Judge Nathaniel Poovey in Ashe County Superior Court. Heard in the Court of Appeals 8 April 2025.

*No brief filed for plaintiff-appellee.*

*Miller & Johnson, PLLC, by Nathan A. Miller, for defendants-appellants.*

*No brief filed for third-party defendant-appellee.*

ZACHARY, Judge.

This case concerns a dispute between neighbors that generated protracted litigation, which ultimately resulted in a declaratory judgment in favor of Plaintiff

Bibiana[1] Villazon "as to her use of [L]ot 177" and the dismissal or denial of all other claims and counterclaims raised by the various parties. Defendants Samuel Alan Osborne and Samantha Hamby appeal from two pretrial orders and the final judgment entered following a jury trial in this matter. Because Defendants are the only appellants, we address only those portions of these proceedings necessary to resolve their appeal.

First, Defendants appeal from the trial court's 13 December 2022 order granting Plaintiff's motion to dismiss two of Defendants' counterclaims. Defendants next appeal from the 17 March 2023 order, in which the court ruled upon various parties' competing motions for summary judgment. Last, Defendants appeal from the final judgment entered on 3 January 2024.

After careful review, we affirm the trial court's 13 December 2022 and 17 March 2023 orders. We also discern no error in the final judgment.

## I.    Background

In 2014, Plaintiff moved into the Ashe Lake community ("Ashe Lake") in West Jefferson, North Carolina. Ashe Lake is governed by a Restriction Agreement that contains a series of restrictive covenants (the "Restrictive Covenants"), which were agreed to and recorded in 1970, when the community was known as Blue Ridge

---

[1] In the final judgment, Plaintiff's first name is spelled "Bibana." However, in the two other orders from which appeal is taken, Plaintiff's first name is spelled "Bibiana." This second spelling appears consistent with the majority of the record, including Plaintiff's complaint.

Estates. Four of the Restrictive Covenants are at issue in this case.

- Paragraph #5, hereinafter "the Nuisance Covenant,"[2] provides: "No noxious or offensive activity shall be carried on upon any lot, nor [shall] anything be done thereon which may be or may become an annoyance or nuisance to the neighborhood."

- Paragraph #6, hereinafter "the Prohibited Residential Structures Covenant," provides: "No structure of a temporary character, basement, tent, shack, garage, barn or other outbuilding [shall] be used on any lot any time as a residence, either temporary or permanent."

- Paragraph #1, hereinafter "the Residential Purpose Covenant," provides: "Lots shall be used only for residential purposes, except as designated by the Company."

- Paragraph #12, hereinafter "the Parking Covenant," provides: "Necessary parking area[s] shall be provided by each individual purchaser in a manner that will not obstruct road traffic."

Plaintiff purchased a series of lots in Ashe Lake upon which she erected a home constructed from shipping containers. She also planned to eventually purchase a lakefront lot in the community, where she would store her kayaks, "have a dock," and "maybe entertain, have a barbecue." In 2021, Plaintiff discovered that a lakefront lot

---

[2] For clarity and readability, we have adopted descriptive titles for each of the four relevant Restrictive Covenants.

("Lot 177") was available. Plaintiff, who runs a business designing docks and other waterfront construction, submitted to the Ashe County Building Department a proposal for the dock that she wanted to build on Lot 177. She also sought approval of her dock project from the Ashe Lake Property Owners' Association, Inc. ("POA"), which approved her plans on 27 July 2021.[3] Based on the answers she received from the POA and the Ashe County Building Department, Plaintiff purchased Lot 177 on 9 August 2021.

Later that month, Plaintiff met Defendant Osborne, a neighboring property owner. Earlier in 2021, Defendants Osborne and Hamby jointly purchased lots located diagonally across the street from Lot 177. However, Defendants' interactions with Plaintiff and her boyfriend, Third-Party Defendant Michael Skinner, quickly grew contentious as Plaintiff built her dock and recreational area on Lot 177. The dispute escalated as, *inter alia*, the parties complained about various activities on their respective properties; exchanged derogatory remarks in public newsletters and on signs posted throughout Ashe Lake; and filmed their increasingly hostile conversations with each other. Among the many topics of contention, Defendants complained that Plaintiff's use of Lot 177 led to parked cars blocking neighborhood

---

[3] Although the issue of the POA's authority to approve or disapprove proposed activities on the Ashe Lake lots was raised below, Defendants advance no such argument before this Court. Accordingly, we shall not address this issue on appeal. *See* N.C.R. App. P. 28(a) ("The scope of review on appeal is limited to issues so presented in the several briefs. Issues not presented and discussed in a party's brief are deemed abandoned.").

traffic. After a couple of months of Defendants' complaints, Plaintiff purchased Lot 50, a lot adjacent to Lot 177; she claimed that she did so "to alleviate the situation," while Defendants believed that the new lot was purchased to be a parking lot for Plaintiff's guests.

On 22 February 2022, Plaintiff filed a complaint against Defendants in Ashe County Superior Court. Plaintiff asserted a claim for private nuisance and requested both declaratory and injunctive relief. Specifically, Plaintiff sought a declaratory judgment affirming that her use of Lot 177 was permitted under the Restrictive Covenants and injunctive relief to prevent Defendants from, *inter alia*, "harassing, bullying, and stalking Plaintiff and her family and guests."

On 25 April 2022, Defendants filed their motions to dismiss, answer, and counterclaims, together with a third-party complaint. Against Plaintiff, Defendants asserted claims for libel per se and breach of the four Restrictive Covenants quoted above. Defendants also sought a declaratory judgment that Plaintiff's use of her Ashe Lake properties was in violation of the Restrictive Covenants. Defendants contended that Plaintiff's shipping-container home violated the Prohibited Residential Structures Covenant and that her use of Lot 177 as a recreational property violated the Residential Purpose, Nuisance, and Parking Covenants.[4]

---

[4] In their counterclaims, Defendants initially mislabeled the Prohibited Residential Structures Covenant, erroneously referencing "Paragraph 5" of the Restrictive Covenants, rather than Paragraph 6. On 5 December 2022, Defendants filed a motion to amend their counterclaims to correct this error.

Defendants also brought claims against Third-Party Defendant Skinner for stalking and libel per se, as well as a claim of breach of fiduciary duty against Third-Party Defendants Hollis Fedrick and Ann Marie Smith, directors of the POA.[5]

Third-Party Defendants Fedrick and Smith filed their answer on 24 June 2022. Plaintiff filed a reply to Defendants' counterclaims on 1 July 2022.

On 30 September 2022, Defendants filed a motion for injunctive relief against Plaintiff and Third-Party Defendant Skinner seeking relief "from having them or their guests harass, threaten, block access, peep with drones or otherwise interfere with . . . Defendants' peaceful use of their real property." That same day, Plaintiff filed a motion for a preliminary injunction against Defendants.

On 23 November 2022, Plaintiff filed a motion to dismiss Defendants' counterclaims for breach of the Restrictive Covenants to the extent that the claims relied upon the Nuisance Covenant. Plaintiff asserted that the Nuisance Covenant was unenforceable because it was void for vagueness. That same day, Third-Party Defendant Skinner filed a motion to dismiss Defendants' stalking claim against him.

In early December 2022, the trial court heard several motions, including: (1) Defendants' motion for injunctive relief; (2) Plaintiff's motion for preliminary

---

The trial court granted this motion by an order entered 9 January 2023, and Defendants subsequently filed an amendment to the counterclaim that correctly referenced Paragraph 6, i.e., the Prohibited Residential Structures Covenant.

[5] Ann Marie Smith was named incorrectly as "AnneMarie Smith" in the caption and body of this initial filing. As part of the 28 February 2023 order denying Third-Party Defendants Fedrick and Smith's motion for summary judgment, the trial court ordered "that the caption shall be changed to reflect the correct spelling of . . . Ann Marie Smith's name."

injunction; (3) Plaintiff's motion to dismiss Defendants' counterclaims regarding breach of the Nuisance Covenant; and (4) Third-Party Defendant Skinner's motion to dismiss the stalking claim.

On 13 December 2022, the trial court entered orders, *inter alia*, denying the parties' respective motions for injunctive relief and granting Plaintiff's motion to dismiss Defendants' breach counterclaims "to the extent that they [we]re based on" the Nuisance Covenant. The court also granted Third-Party Defendant Skinner's motion to dismiss the stalking claim.

Plaintiff filed a motion for summary judgment on 28 December 2022. On 20 January 2023, Defendants filed a motion for partial summary judgment on their counterclaims that Plaintiff breached the Residential Purpose, Prohibited Residential Structures, and Parking Covenants. Plaintiff filed an amended motion for summary judgment that same day. On 23 January 2023, Third-Party Defendants Fedrick and Smith also filed a motion for summary judgment.

On 30 January 2023, a group of other Ashe Lake property owners ("the Intervenors") filed a motion to intervene. The Intervenors claimed that Plaintiff was violating the Restrictive Covenants, requested that the trial court reject her claims related to the Restrictive Covenants, and sought declaratory and injunctive relief to that effect. With the consent of the other parties, on 28 February, the trial court entered an order granting the Intervenors' motion to intervene.

That same day, the court also entered an order denying Third-Party

Defendants Fedrick and Smith's motion for summary judgment. On 6 March 2023, Third-Party Defendants Fedrick and Smith filed a "motion to amend judgment and/or for relief from judgment" pursuant to N.C. R. Civ. P. 59 and 60(b)(6), seeking reconsideration of the court's denial of their motion for summary judgment.

On 16 March 2023, Plaintiff filed an answer to the Intervenors' claims, in which she, *inter alia*, raised counterclaims against the Intervenors for breach of the Restrictive Covenants and sought a declaratory judgment to that effect. Plaintiff also filed a third-party complaint against the POA, in which she raised claims for negligent and intentional misrepresentation, fraud, breach of fiduciary duty, and negligence.

On 17 March 2023, the trial court entered an order granting in part Plaintiff's amended motion for summary judgment as to the Prohibited Residential Structures Covenant but otherwise denying the parties' motions for summary judgment. On 24 March 2023, the court entered an order granting Third-Party Defendants Fedrick and Smith's motion under Rules 59 and 60(b)(6) and entered summary judgment in their favor.[6] On 10 July 2023, Plaintiff settled her claims against the POA.

---

[6] We note that the use of Rules 59 or 60(b) to reconsider an interlocutory, pretrial ruling denying Third-Party Defendants Fedrick and Smith's motion for summary judgment was improper. *See Doe v. City of Charlotte*, 273 N.C. App. 10, 15, 848 S.E.2d 1, 6 (2020) ("Rule 59 is not an appropriate means of seeking reconsideration of interlocutory, pre-trial rulings of trial courts."); *Pratt v. Staton*, 147 N.C. App. 771, 775, 556 S.E.2d 621, 624 (2001) ("By its express terms, Rule 60(b) only applies to final judgments, orders, or proceedings; it has no application to interlocutory orders."). Rather, "in a case like this one involving partial summary judgment, the party seeking reconsideration can move for that relief under Rule 54(b)." *Doe*, 273 N.C. App. at 19, 848 S.E.2d at 8. Rule 54(b) provides, in

After a mistrial, on 27 November 2023, this matter came on for an eight-day jury trial. On 30 November 2023, at the close of Plaintiff's evidence, Defendants made a motion for a directed verdict on the declaratory judgment action and the private-nuisance claim, which the trial court denied. The Intervenors also moved for directed verdict on Plaintiff's counterclaims against them; the trial court granted their motion in open court and by order entered on 4 December 2023. Also on 4 December, while the trial was ongoing, the Intervenors settled and voluntarily dismissed their claims against Plaintiff.

At the close of all evidence, the remaining parties renewed their respective motions for directed verdict, with significant arguments from Plaintiff and Defendants regarding the Residential Purpose and Parking Covenants. The court granted Plaintiff's directed-verdict motion as to Defendants' claims for breach of the Residential Purpose and Parking Covenants but otherwise denied the parties' motions.

Plaintiff's claim against Defendants for private nuisance and Defendants' libel claims against Plaintiff and Third-Party Defendant Skinner were submitted to the jury. On 6 December 2023, the jury issued unanimous verdicts denying all of these

---

pertinent part, that "in the absence of entry of such a final judgment, any order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties." N.C. Gen. Stat. § 1A-1, Rule 54(b) (2023). However, this matter is not before us, as Defendants did not appeal from the 24 March 2023 order granting summary judgment in favor of Third-Party Defendants Fedrick and Smith.

claims. On 3 January 2024, the trial court entered a final judgment memorializing its rulings on the parties' directed-verdict motions as well as the jury's verdicts.

Defendants timely moved for a new trial pursuant to Rule 59, which the trial court denied on 23 January 2024. Defendants then filed timely notice of appeal from (1) the 13 December 2022 order granting Plaintiff's motion to dismiss Defendants' counterclaims regarding breach of the Nuisance Covenant; (2) the 17 March 2023 order granting in part Plaintiff's amended motion for summary judgment as to the Prohibited Residential Structures Covenant but otherwise denying the parties' motions for summary judgment; and (3) the final judgment entered on 3 January 2024.

## II.    Discussion

Defendants raise four issues on appeal. First, they argue that the trial court erred by granting Plaintiff's motion to dismiss their counterclaims to the extent that the claims were based upon the Nuisance Covenant. They next contend that the court erred by denying their motion for summary judgment and by granting Plaintiff's amended motion for summary judgment in part as to Defendants' counterclaim alleging Plaintiff's violation of the Prohibited Residential Structures Covenant. Then, Defendants assert that the trial court erred by denying their motion for directed verdict and granting Plaintiff's motion for directed verdict in part as to Defendants' counterclaim alleging Plaintiff's Lot 177 violations of the Residential Purpose and Parking Covenants. Finally, based on these three issues, Defendants maintain that

the court erred by entering the final judgment. We disagree.

## A. Interpretation of the Restrictive Covenants

"Covenants accompanying the purchase of real property are contracts which create private incorporeal rights, meaning non-possessory rights held by the seller, a third-party, or a group of people, to use or limit the use of the purchased property." *Armstrong v. Ledges Homeowners Ass'n*, 360 N.C. 547, 554, 633 S.E.2d 78, 85 (2006).

> Because covenants originate in contract, the primary purpose of a court when interpreting a covenant is to give effect to the *original* intent of the parties; however, covenants are strictly construed in favor of the *free use of land* whenever strict construction does not contradict the plain and obvious purpose of the contracting parties.

*Id.* at 555, 633 S.E.2d at 85.

"The rule of strict construction is grounded in sound considerations of public policy: It is in the best interests of society that the free and unrestricted use and enjoyment of land be encouraged to its fullest extent." *J. T. Hobby & Son, Inc. v. Family Homes of Wake Cty., Inc.*, 302 N.C. 64, 71, 274 S.E.2d 174, 179 (1981). "Such construction in favor of the unrestricted use, however, must be reasonable. The strict rule of construction as to restrictions should not be applied in such a way as to defeat the plain and obvious purposes of a restriction." *Long v. Branham*, 271 N.C. 264, 268, 156 S.E.2d 235, 239 (1967) (citation omitted).

"As a consequence, the law declares that nothing can be read into a restrictive covenant enlarging its meaning beyond what its language plainly and unmistakably

imports." *Erthal v. May*, 223 N.C. App. 373, 380, 736 S.E.2d 514, 518 (2012) (citation omitted), *appeal dismissed and disc. review denied*, 366 N.C. 421, 736 S.E.2d 761 (2013). "This is in accord with general principles of contract law, that the terms of a contract must be sufficiently definite that a court can enforce them. Accordingly, courts will not enforce restrictive covenants that are so vague that they do not provide guidance to the court." *Id.* at 380, 736 S.E.2d at 518–19 (citation omitted).

"In interpreting ambiguous terms in restrictive covenants, the intentions of the parties at the time the covenants were executed ordinarily control, and evidence of the situation of the parties and the circumstances surrounding the transaction is admissible to determine intent." *Angel v. Truitt*, 108 N.C. App. 679, 681, 424 S.E.2d 660, 662 (1993) (cleaned up). Nevertheless, "it is not primarily the intention of the parties which the court is seeking, but the meaning of the words at the time and place when they were used." *Id.* (cleaned up).

## B. The Nuisance Covenant

Defendants first allege that the trial court erred by granting Plaintiff's motion to dismiss their counterclaims for breach of the Restrictive Covenants to the extent that they were based on the Nuisance Covenant. Specifically, Defendants contend that the trial court erred by determining that the Nuisance Covenant was void for vagueness. We disagree.

### 1. *Standard of Review*

A motion to dismiss pursuant to Rule 12(b)(6) of the North Carolina Rules of

Civil Procedure "is a proper vehicle for dismissing a complaint when it fails to state a claim upon which relief can be granted." *Andresen v. E. Realty Co.*, 60 N.C. App. 418, 420, 298 S.E.2d 764, 765 (1983). "[T]he complaint must be viewed as admitted, and on that basis the court must determine as a matter of law whether the allegations state a claim for which relief may be granted." *Id.* (citation omitted).

### 2. Analysis

By order entered 13 December 2022, the trial court granted Plaintiff's motion to dismiss Defendants' counterclaims to the extent that they were based upon the Nuisance Covenant.

It is well established that "courts will not enforce restrictive covenants that are so vague that they do not provide guidance to the court." *Steiner v. Windrow Ests. Home Owners Ass'n*, 213 N.C. App. 454, 458, 713 S.E.2d 518, 522 (2011) (citation omitted). "Covenants restricting the use of property are to be strictly construed against limitation on use, and will not be enforced unless clear and unambiguous." *Id.* (citation and emphasis omitted).

In *Steiner*, this Court reviewed similar language in a restrictive covenant that proscribed "offensive or noxious activity . . . tending to cause embarrassment, discomfort, annoyance, or nuisance to the neighborhood." *Id.* at 465, 713 S.E.2d at 526. The *Steiner* Court recognized that "each of these words describes a subjective and personal experience or feeling. Just as beauty is in the eye of the beholder, each of these terms can be defined only from the perspective of the beholder." *Id.* at 466,

713 S.E.2d at 527 (footnote omitted). Consequently, we concluded that the challenged covenant was void for vagueness in that it did "not give sufficient guidance or definitions to the aforementioned terms to permit us to make any sort of legal determination as to what [it] mean[t] or should mean to the . . . neighborhood." *Id.* at 466–67, 713 S.E.2d at 527.

On appeal, Defendants attempt to distinguish *Steiner* on the grounds that the Nuisance Covenant "does not contain the other subjective words as the one[s] in the *Steiner* case and relies simply on two words": (1) "annoyance" and (2) "nuisance." Defendants posit that the term "nuisance" "cannot be void for vagueness as that is a recognized cause of action in North Carolina"; meanwhile, the "common definition" of the term "annoyance" is easily "ascertain[ed] and [was] utilized in the nuisance jury instruction." These assertions are meritless.

As the trial court aptly explained at the December 2022 hearing regarding Plaintiff's motion to dismiss:

> [P]art of the issue on the vagueness could be . . . when you talk about an annoyance or nuisance to a group; in other words, to the neighborhood. I'm not reading it independently. It's vague. We don't know what the neighborhood is other than perhaps all members of the parties to the [POA], and how do you determine on a broad level what's annoying to them . . . .

The court then illustrated why a private nuisance claim does not present the same vagueness concern:

> THE COURT: Well, I think the vagueness issue is

- 14 -

> potentially from the [c]ourt's perspective[:] how do we know what's annoying to a group? How does somebody -- if you have 100 homeowners, how do we know what's annoying to the entire group? We don't. That's why the Court of Appeals said that . . . a private nuisance action is one homeowner against another homeowner or neighboring property owners --
>
> [PLAINTIFF'S COUNSEL]: Correct.
>
> THE COURT: -- and whether or not it's the substantial and unreasonable interference as between those two property owners.

As in *Steiner*, the Nuisance Covenant at issue here "do[es] not provide sufficient guidance or definitions to permit . . . any sort of objective determination of who is right, and this is the essence of vagueness." *Id.* at 467, 713 S.E.2d at 527. This is so regardless of the existence of a private nuisance claim—which Defendants notably did not raise against Plaintiff in this case—because the dispositive issue here is not whether nuisance "is a recognized cause of action" but rather whether the phrase "an annoyance or nuisance to the neighborhood" as used in the Nuisance Covenant is "clear and unambiguous." *Id.* at 458, 713 S.E.2d at 522 (citation and emphasis omitted).

As the *Steiner* Court explained, we must construe the term "nuisance" in this context "using its 'ordinary meaning' and not a legal definition." *Id.* at 466 n.8, 713 S.E.2d at 527 n.8. For the reasons stated in *Steiner* and echoed by the trial court in the present case, the phrase "an annoyance or nuisance to the neighborhood" as used in the Nuisance Covenant is not "clear and unambiguous." *Id.* at 458, 713 S.E.2d at

522 (citation and emphasis omitted). Accordingly, the court did not err by granting Plaintiff's motion to dismiss Defendants' counterclaims for breach of the Restrictive Covenants to the extent that they were based upon the Nuisance Covenant, and Defendants' argument is overruled.

## C. The Prohibited Residential Structures Covenant

Defendants next appeal from the trial court's 17 March 2023 order. They assert that the trial court erred by denying their motion for summary judgment and partially granting Plaintiff's amended motion for summary judgment as to Defendants' counterclaim concerning the Prohibited Residential Structures Covenant.

We first note that "[t]he denial of a motion for summary judgment is an interlocutory order and is not appealable." *Harris v. Walden*, 314 N.C. 284, 286, 333 S.E.2d 254, 256 (1985). Further, "the denial of a motion for summary judgment is not reviewable during appeal from a final judgment rendered in a trial on the merits." *Id.* Thus, to the extent that Defendants seek review of the denial of their motion for summary judgment on this issue, such review is unavailable.

Nevertheless, upon the entry of a final judgment, the trial court's partial grant of Plaintiff's amended motion for summary judgment as to Defendants' counterclaim concerning the Prohibited Residential Structures Covenant "became an appealable order." *D.G. II, LLC v. Nix*, 213 N.C. App. 220, 229, 713 S.E.2d 140, 147 (2011). Therefore, although we may not review the denial of Defendants' motion for summary

judgment on this issue, we may review the partial grant of Plaintiff's amended motion for summary judgment on appeal from the final judgment in this matter.

### 1. *Standard of Review*

This Court reviews a trial court's rulings on a motion for summary judgment de novo, and in doing so "we view the evidence in the light most favorable to the non-movant." *Erthal*, 223 N.C. App. at 377, 736 S.E.2d at 517 (citation omitted). Appellate review of a trial court's grant of summary judgment "requires a two-part analysis of whether, (1) the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact; and (2) the moving party is entitled to judgment as a matter of law." *Id.* at 378, 736 S.E.2d at 517 (citation omitted).

> Summary judgment is appropriate if: (1) the non-moving party does not have a factual basis for each essential element of its claim; (2) the facts are not disputed and only a question of law remains; or (3) if the non-moving party is unable to overcome an affirmative defense offered by the moving party.

*Id.* (citation omitted).

### 2. *Analysis*

Defendants first contend that the trial court erred by concluding that Plaintiff's "shipping container residence" was not a "structure of a temporary character" within the meaning of the Prohibited Residential Structures Covenant and therefore, did not violate the Restrictive Covenants. As stated above, the Prohibited Residential

Structures Covenant provides: "No structure of a temporary character, basement, tent, shack, garage, barn or other outbuilding [shall] be used on any lot any time as a residence, either temporary or permanent." The covenant does not define "structure of a temporary character"; it merely provides a list of proscribed structures. Thus, we must determine whether Plaintiff's "shipping container residence" falls within the prohibited category of a "structure of a temporary character."

The record reflects that throughout this litigation, Defendants have presented their argument on this issue as if it were self-evident as a matter of law. In their initial counterclaim, Defendants simply asserted that "Plaintiff's residence constructed out of shipping containers is a residence *made from a structure of temporary character*." (Emphasis added). And in their appellate brief, Defendants rely upon *Young v. Lomax*, 122 N.C. App. 385, 470 S.E.2d 80 (1996). The *Young* Court concluded that the residence at issue was a mobile home—a type of structure that was explicitly prohibited by the applicable restrictive covenant in that case—and held that "rendering a structure immobile after it has been installed does not change the fact that the structure is still a mobile home." 122 N.C. App. at 388, 470 S.E.2d at 82.

Defendants posit that Plaintiff's argument below—that her shipping-container residence was "no longer of a temporary character because she . . . affixed it to a foundation and ha[d] a deck constructed around it"—necessarily "fails as a matter of law" under *Young*; according to Defendants, "[s]hipping containers are by their very nature constructed to be of a temporary character." Yet, Defendants candidly

acknowledge that "[t]here is no case in North Carolina [of which they] are aware that addresses shipping containers being converted into homes." This admission is only one of several reasons why *Young* does not control this case.

On a fundamental level, the well-established principles directing the interpretation of restrictive covenants remind us that "[e]ach case must be determined on its own particular facts." *Long*, 271 N.C. at 274, 156 S.E.2d at 242. Rendering a mobile home immobile presents a different factual question than utilizing shipping containers as building materials in the construction of a permanent home. Defendants fail to persuade with their bare and conclusory assertions that Plaintiff's home simply *is* a "structure of a temporary character" as a matter of law. And insofar as Defendants rely upon *Young* for these erroneous conclusions, their reliance is misplaced.

Instead of straining for precedent to analogize to the facts of the present case, we properly focus our analysis on the plain, unambiguous text of the Prohibited Residential Structures Covenant, which truly governs this issue. The plain text of this covenant contains a list of prohibited structures—not prohibited building materials. This text evinces the drafters' concern with the permanent character of the final residential structure, rather than the character of the base construction materials.

Moreover, notwithstanding Defendants' unsupported and conclusory contentions otherwise, the use of recycled or found materials in the construction of a

residence does not necessarily render the residence temporary. Thus, Plaintiff's use of shipping containers does not, in and of itself, make her residence a "structure of a temporary character" under the Prohibited Residential Structures Covenant.

In the order granting Plaintiff's amended motion for summary judgment on this issue, the trial court properly focused on the permanent character of Plaintiff's residence, reasoning that

> Plaintiff's home has: i) a continuous block foundation; ii) a permanent deck; iii) the containers are permanently welded together; iv) the construction was inspected at each stage of construction; v) the construction was pursuant to a building permit; and vi) the home is in compliance with the Ashe County Building Code Requirements.

The court's summary-judgment order demonstrates a reasonable interpretation of the Prohibited Residential Structures Covenant, consistent with the covenant's plain text and properly favoring the unrestricted use of Plaintiff's property. *See id.* at 268, 156 S.E.2d at 239. Defendants have failed to show a "genuine issue as to any material fact" regarding whether Plaintiff's home is a "structure of a temporary character" under the Prohibited Residential Structures Covenant, or that Plaintiff was not "entitled to judgment as a matter of law." *Erthal*, 223 N.C. App. at 378, 736 S.E.2d at 517 (citation omitted). Therefore, the trial court did not err in granting Plaintiff's amended motion for summary judgment on this issue, and Defendants' argument is overruled.

**D. The Residential Purpose and Parking Covenants**

Defendants also contend that the trial court erred by denying their motion for summary judgment as to whether Plaintiff's use of Lots 177 and 50 violated the Residential Purpose and Parking Covenants. Relatedly, Defendants assert that the court erred by denying their motion for directed verdict and by granting Plaintiff's motion for directed verdict on this issue.

However, as previously recognized, the denial of Defendants' motion for summary judgment "is not reviewable during appeal from a final judgment rendered in a trial on the merits." *Harris*, 314 N.C. at 286, 333 S.E.2d at 256. We therefore limit our review to Defendants' arguments concerning the trial court's entry of directed verdict in favor of Plaintiff.

### 1. *Standard of Review*

"A directed verdict is properly granted where it appears, as a matter of law, that the nonmoving party cannot recover upon any view of the facts which the evidence reasonably tends to establish." *Merrick v. Peterson*, 143 N.C. App. 656, 661, 548 S.E.2d 171, 175 (citation omitted), *disc. review denied*, 354 N.C. 364, 556 S.E.2d 572 (2001). "When a court considers the propriety of a directed verdict motion, the nonmoving party is entitled to the benefit of every reasonable inference which may be legitimately drawn from the evidence, and all evidentiary conflicts must be resolved in favor of the nonmoving party." *Id.* "The motion for directed verdict should be denied if there is more than a scintilla of evidence supporting each element of [the] claim." *Id.*

Further, "Rule 50(a) requires that a motion for directed verdict state the specific grounds therefor." *Vanguard Pai Lung, LLC v. Moody*, 387 N.C. 376, 380, 912 S.E.2d 788, 792 (2025) (cleaned up); *see* N.C. Gen. Stat. § 1A-1, Rule 50(a). "This ensures that the trial court and the nonmoving party have adequate notice of those arguments." *Vanguard Pai Lung*, 387 N.C. at 381, 912 S.E.2d at 792 (cleaned up).

Consistent with Rule 50(a), "this Court, in reviewing a grant of directed verdict, may consider all of the grounds specifically stated by the moving party in its motion to the trial court," and the moving party is not allowed "to make an argument in support of directed verdict for the first time on appeal." *Merrick*, 143 N.C. App. at 662, 548 S.E.2d at 175. Moreover, "[i]n cases involving multiple defenses and theories of liability, it is critical that the movant direct the trial court with specificity to the grounds for its motion for a directed verdict." *Vanguard Pai Lung*, 387 N.C. at 381, 912 S.E.2d at 793 (cleaned up). "When a specific argument or theory that forms a ground for relief is not expressly stated in a directed verdict motion, that issue is waived . . . ." *Id.* Put another way, "[i]n a case involving multiple claims or defenses, an issue is raised at the directed verdict stage only if the movant expressly articulates that specific argument or theory to the trial court." *Id.* at 377, 912 S.E.2d at 790.

### 2. *The Residential Purpose Covenant*

Defendants argue that the trial court erred by denying their motion for directed verdict and by granting Plaintiff's motion for directed verdict because, *inter alia*, Plaintiff's recreational use of Lot 177 violated the Residential Purpose

Covenant. Defendants claim that Plaintiff's use of Lot 177 "merely for recreational purposes" did not fall within the Residential Purpose Covenant's requirement of use "only for residential purposes."

We begin our analysis cognizant of our Supreme Court's instruction that the primary approach for a court's exercise of "[s]ound judicial construction of restrictive covenants" is to follow "the intentions of the parties," including adherence to "the natural meaning of the words, provided that the meanings of the relevant terms have not been modified by the parties to the undertaking." *J. T. Hobby*, 302 N.C. at 71, 274 S.E.2d at 179.

As quoted above, the Residential Purpose Covenant provides: "Lots shall be used only for residential purposes, except as designated by the Company." In *J. T. Hobby*, the defendants, a married couple who operated a home for special-needs adults, argued that their property had a "residential," rather than "institutional," purpose, because it was "used for the habitation of human beings and for those activities such as eating, sleeping, and engaging in recreation which are normally incident thereto." *Id.* at 71–72, 274 S.E.2d at 179–80. While declining to adopt this definition of "residential," our Supreme Court agreed with the defendants that their home had a residential purpose and rejected the plaintiffs' argument analogizing the the defendants' establishment with that of a boarding house. *See id.* at 71–74, 274 S.E.2d at 179–81.

In the instant case, Defendants contend that this precedent "created a two-

part requirement to meet the definition of residential with the first requirement being that the lot be used for human habitation and the second that it is utilized for other activities such as eating, sleeping and recreation but it requires both." Not so. Defendants' "two-part requirement" is an overread of *J. T. Hobby* for two reasons. First, the "requirement" that Defendants cite was actually the Supreme Court's recapitulation of one of the parties' arguments; but the Court did not adopt that argument, much less make it a requirement "to meet the definition of residential." Second, Defendants' interpretation of *J. T. Hobby* stands in contrast to the well-established interpretive principle that "covenants are strictly construed in favor of the *free use of land* whenever strict construction does not contradict the plain and obvious purpose of the contracting parties." *Armstrong*, 360 N.C. at 555, 633 S.E.2d at 85.

Even taken in the light most favorable to Defendants, there is no reading of the Residential Purpose Covenant that supports their insistence that the phrase "residential purposes" necessarily "requires habitation." The most reasonable reading of the Residential Purpose Covenant, one that follows "the intentions of the parties" and adheres "to the natural meaning of the words," *J. T. Hobby*, 302 N.C. at 71, 274 S.E.2d at 179, is that the phrase "residential purposes" in this covenant *does not* necessarily require habitation, despite Defendants' assertion otherwise.

In their appellate brief, Defendants offer a plethora of possible extreme, imagined recreational uses that might be permitted in other hypothetical cases if

Plaintiff's use of Lot 177 were allowed, such as "ball fields, concert venues, dirt tracks, [and] paintball course[s]." Indeed, recognizing that no North Carolina case addresses the purely recreational use of property in this context, Defendants instead direct us—as they did the trial court below—to *Rawan v. Massad*, in which the Appeals Court of Massachusetts held that "the hosting of organized league baseball games" violated a restrictive covenant limiting the property at issue "to use for 'single[-]family residential purposes only.' " 80 Mass. App. Ct. 826, 830, 957 N.E.2d 248, 251 (2011).

Yet, Defendants' "parade of horribles" again ignores the well-settled rule of the interpretation of restrictive covenants that "[e]ach case must be determined on its own particular facts." *Long*, 271 N.C. at 274, 156 S.E.2d at 242. On this issue, Defendants rely upon inapplicable authority and ignore the pertinent facts of this case. We cannot accept Defendants' arguments.

"[I]t appears, as a matter of law, that [Defendants] cannot recover upon any view of the facts which the evidence reasonably tends to establish" even when viewed in the light most favorable to them. *Merrick*, 143 N.C. App. at 661, 548 S.E.2d at 175 (citation omitted). Therefore, the trial court did not err by granting Plaintiff's motion for directed verdict on the issue of the Residential Purpose Covenant.

### 3. *The Parking Covenant*

As regards the Parking Covenant, Defendants contend that "[u]ncontroverted evidence was presented at the trial that no parking was provided for" Lot 177 and that Plaintiff "openly admitted that there was not enough parking for" Lot 177. To

the contrary, our careful review of the transcript, and specifically those portions that Defendants cite for these propositions, reveals no such evidence or admission. Indeed, portions of the transcript contain Plaintiff's repeated denials of Defendants' accusations concerning parking and her explanation that she did not purchase Lot 50 "solely for parking" for Lot 177—as Defendants assert—but rather "for a couple of reasons," including that it could "alleviate some of the animosity or situation with" Defendants.

Defendants have failed to show that the evidence at trial regarding Plaintiff's alleged violation of the Parking Covenant was "[u]ncontroverted." In that these assertions represent the entirety of Defendants' directed-verdict arguments concerning the Parking Covenant, Defendants also fail to persuade on this issue.

**E. Final Judgment**

Lastly, Defendants "adopt and incorporate" each of their prior arguments in support of their contention that the trial court erred by entering its final judgment. As each of those arguments failed previously, so too must they here.

### III.    Conclusion

For the foregoing reasons, we affirm the trial court's 13 December 2022 and 17 March 2023 orders, and we discern no error in the trial court's final judgment.

AFFIRMED IN PART; NO ERROR IN PART.

Judges GRIFFIN and FLOOD concur.